695 So.2d 209 (1996)
Jimmy Shane CLICK
v.
STATE.
CR-93-1911.
Court of Criminal Appeals of Alabama.
December 20, 1996.
Rehearing Denied February 28, 1997.
Certiorari Denied May 9, 1997.
*215 John Mark McDaniel and William P. Burgess, Jr., Huntsville, for Appellant.
Jeff Sessions, Atty. Gen., and Cedric Colvin, Deputy Atty. Gen., for Appellee.
Alabama Supreme Court 1961000.
COBB, Judge.
The appellant, Jimmy Shane Click, was indicted for the capital murder of Ginger Roberta McClure, which occurred during the late evening hours of July 24, or early morning hours of July 25, 1990. For ease of reference, the date of the murder will subsequently be referred to as July 24, 1990. On June 18, 1994, the appellant was found guilty of capital murder; he was subsequently sentenced to life in the penitentiary without the possibility of parole.
The State's evidence tended to show that on or about July 24, 1990, the appellant, then age 17, and codefendant Scott Carpenter, aged 18, entered the home of Ginger Roberta McClure and beat her to death. Evidence showed that the appellant sprayed mace in the victim's face while she was in her bed and that Carpenter repeatedly struck her with a baseball bat. The motive for the murder appeared to be that the appellant owed the victim money that he did not want to repay.
Ms. Charleen Bottorff, a friend of appellant's and Carpenter's girlfriend, testified that the appellant and Carpenter had been talking about killing the victim and planning the crime for at least a week before the killing. According to Bottorff, she, Click, and Carpenter went to an army surplus store and bought a can of tear gas which was later used in the homicide. She testified that on the night of the killing she drove the two men to a location close to the victim's house and dropped them off. Bottorff testified that she was told to wait by a pay telephone at a local motel until they telephoned her to pick them up and that if the two had not called by a certain time she was to pick them up at a pre-arranged site. (R. 303.) She also testified that when she picked them up later that evening both men had blood all over their arms. According to Ms. Bottorff, the appellant told Carpenter in the car that he had "done a real good job" hitting the victim. (R. 310.) After hiding some things at various locations around Huntsville, all three went to her apartment and slept. Click, she testified, awakened early the next morning because he had to go to his job at a local restaurant. (R. 318.)
The police questioned the appellant based upon information that he had been seen at the victim's house on the evening of the murder. The appellant told the police that he had known the victim for about eight years and that he mowed her grass. During the interrogation, the police determined that Click fit the description of a person who had been seen in the woods behind the victim's house on the day of the crime. The appellant was then informed of his rights. Thereafter, he admitted that he sprayed the victim with mace just before Carpenter beat her to death with the baseball bat. He also stated *216 that he and Carpenter had taken money, drugs, and other items from the victim's house.
The appellant raises 24 issues on appeal.

I.
The appellant contends that the trial court erred in denying his motion to suppress his statements to the police. The appellant asserts two grounds upon which his statements should have been suppressed. First he contends that the statements were obtained through duress or improper inducement in violation Article 1, § 5, Constitution of Alabama of 1901 and the Fourth Amendment of the United States Constitution, which protect against illegal searches and seizures. Additionally the appellant asserts that because he suffered from a mental illness when he was advised of Miranda rights, he was unable to understand the nature and quality of the warnings and he could not, therefore, knowingly and intelligently waive them.

A.
The record shows that Investigators Wayne Sharp and Howard Turner went to the appellant's house at 9:30 P.M. on July 25, 1990, the day the murder was discovered, in response to information that Click had been seen at the victim's house the day before. The appellant arrived home at around 10:00 P.M., and, after a brief conversation regarding his acquaintance with the victim, he and his stepfather followed the investigators to police headquarters for questioning. (R. 471-73, 662-65, 714.) Turner testified that interviewing for the purposes of a criminal investigation of this nature always took place at the police station at the request of the investigator. (R. 740.) At police headquarters, beginning around 10:45 P.M., the appellant gave Investigator Sharp an account of what he had done at the victim's house the day before. Nothing he told the investigator at this point indicated any involvement in McClure's death. (R. 476-78, 670-72).
At approximately 11:00 P.M., Investigator Turner came into the interview room where appellant was being questioned and had a conversation with Investigator Sharp. Investigator Sharp then advised appellant of his juvenile Miranda rights. (R. 477-78, 672-73). Investigator Turner testified that the juvenile Miranda rights were read to Click immediately after he received information that the appellant matched the description of a person seen in the woods behind the victim's house the evening of the murder. Testimony of Investigators Sharp and Turner revealed that the appellant was not a suspect before they received this information. (R. 478.)
After the appellant was advised of his Miranda rights at approximately 11:10 P.M., and before approximately 2:50 A.M. the following morning, he gave the investigators two more versions of his activities on the day of the murder. (R. 486-90.) The final version of his statement detailed his involvement in the homicide.
The appellant maintains that he should have been advised of his Miranda rights when the investigators began interviewing him at his house because, he says, he was a suspect at that point. The appellant further alleges that he was in custody for the purposes of Miranda when he was taken into the interview room at the police station, and that his stepfather should have been allowed to be present during the interview or apprised of what was going on during the course of the interview. The appellant also alleges that the investigators questioned him continually until he made the incriminating statement. This allegation was based on testimony by Investigator Sharp that he continued his questioning after he determined that the appellant was tired. (R. 536.) Additionally, the appellant argues that Investigator Sharp improperly induced him into making a confession by improperly giving him legal advice.
It is well established that "the prosecution may not use statements, whether exculpatory or inculpatory, of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." Miranda v. Arizona, 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694, (1966). However, the safeguards required by Miranda are required only if the defendant is in custody when *217 questioned. Berkemer v. McCarty, 468 U.S. 420, 440, 104 S.Ct. 3138, 3150, 82 L.Ed.2d 317 (1984); Landreth v. State, 600 So.2d 440, 444 (Ala.Cr.App.1992).
We conclude that the appellant was advised of his Miranda rights at the proper time and in the proper manner by the investigators involved in the case. The appellant's interrogation did not become custodial in nature until just before he was advised of his rights. The appellant's initial statement to the police was made at the police station and before he was the focus of the investigation.
It is inevitable that the appellant would have been questioned by the police because they had information that he was one of the last persons to see the victim alive. Nothing in the record suggests that the appellant was not free to leave the police station or that he was in custody until the point at which he became a suspect and was advised of his rights. The record indicates that his stepfather arrived with the appellant and had been waiting outside the interview room to take him home.
Also, the fact that the questioning occurred at the police station does not necessarily lead to a conclusion that appellant was in custody for Miranda purposes.
"[P]olice officers are not required to administer Miranda warnings to everyone they question. Nor is the requirement of warnings to be imposed simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect."
Oregon v. Mathiason, 429 U.S. 492, 495, 97 S.Ct. 711, 714, 50 L.Ed.2d 714 (1977).
The appellant's contentions that his incriminating statement was made under duress because his stepfather was not allowed to be present in the interview room and because he was tired when he made the statement are also without merit. The trial record gives no indication that the appellant asked for his stepfather to be present during the interview. To the contrary, the record reflects that the appellant asked investigators to make his stepfather leave the building after he had been read his rights. (R. 675.)
Also missing from the record is any indication that the appellant requested that the investigators stop their questioning because he was tired. The appellant had been advised of his rights and had consented to further questioning; therefore, the statements he subsequently made were properly admitted.
Additionally the appellant's claim that Investigator Sharp gave him legal advice is without merit. This allegation is addressed in the following testimony from Investigator Sharp during the State's direct examination:
"[The appellant] asked me, if someone is present when someone gets killed, but not involved, would he be arrested? I told him it was according to the circumstances. If he had any involvement in it, or, you know, just according to the circumstances as to whether the person would be arrested or not. And then it was around 1:30 he told me he was going to tell me the truth."
(R. 448.) The investigator's comment was in response to a direct question by the appellant and suggested no particular course of action for appellant to take at that point. It was not legal advice.
The trial court did not err in admitting the appellant's statements into evidence.

B.
The appellant's second argument with regard to the Miranda issue is that he suffered from a mental illness that prevented him from voluntarily waiving his rights because, he says, he could not understand and comprehend the significance of those rights. The appellant cites that he was diagnosed with a mental disorder at the age of eight years old, that he had twice undergone inpatient treatment at the psychiatric unit at Mountain View Baptist Hospital in 1989, and that he was being treated with psychotropic and antidepressant drugs at the time of his arrest. (R. 597-607.) Additionally, Dr. James Merikangas, appellant's expert witness, testified at the suppression hearing that, in his opinion, the appellant could not have knowingly and intelligently waived his Miranda warnings because he suffered from a mental illness. (R. 615-17.) Both Dr. *218 Merikangas, who evaluated the appellant in 1993, and Dr. Sheila Clark, who was the psychiatrist at Mountain View Baptist Hospital who was treating the appellant before his arrest, had diagnosed the appellant with "schizo-affective" disorder.
The State argues that although the appellant suffered from a mental disease or defect, he was competent to waive his Miranda rights. As grounds for its argument, the State cites the trial testimony of Dr. Frank Preston, a psychologist who was treating the appellant prior to his arrest and who had last seen the appellant on the evening before Ms. McClure was killed. Dr. Preston testified that the appellant was acting normally and that he appeared to be lucid at that time. (R. 632.)
Whether a waiver is voluntary, knowing, and intelligent depends on the particular facts and underlying circumstances of each case, including the background, experience, and conduct of the accusedi.e., the totality of the circumstances. Magwood v. State, 494 So.2d 124, 135 (Ala.Cr.App.1985),aff'd, 494 So.2d 154 (Ala.), cert. denied, 479 U.S. 995, 107 S.Ct. 599, 93 L.Ed.2d 599 (1986); Chandler v. State, 426 So.2d 477 (Ala. Cr.App.1982) (citing Edwards v. Arizona, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981)); Myers v. State, 401 So.2d 288 (Ala. Cr.App.1981.) The trial court need only be convinced from a preponderance of the evidence that a confession or inculpatory statement was voluntarily made. Magwood v. State, supra; Harris v. State, 420 So.2d 812 (Ala.Cr.App.1982). The finding of the trial court as to voluntariness will not be disturbed unless it appears contrary to the great weight of the evidence. Dill v. State, 600 So.2d 343, 368 (Ala.Cr.App.1991), aff'd, 600 So. 2d 372 (Ala.1992), cert. denied, 507 U.S. 924, 113 S.Ct. 1293, 122 L.Ed.2d 684 (1993); Magwood v. State, supra.
In the instant case the trial judge had ample evidence from which to conclude that the appellant voluntarily and knowingly waived his Miranda rights. Doctor Merikangas testified that his opinion was based on an examination that took place approximately two and one-half years after the appellant was arrested. (R. 620.) Dr. Preston's testimony that the appellant appeared to be lucid on the day before he was arrested was based on personal observation. Additionally, the investigators who took the appellant's statements testified that there was nothing about his appearance or demeanor to suggest that he was suffering from a mental illness at the time he waived his rights or that he did not understand his rights when he waived them. (R. 485-92.) There was evidence that despite his mental condition, the appellant had performed in the superior range (130 to 149) on an I.Q. test. (R. 594, 601.) This information, when combined with other factors such as the appellant's planning of Ms. McClure's death and his subsequent efforts to conceal his involvement in her death from the investigators, leads us to conclude that the trial court was correct in determining that the appellant was capable of understanding his rights when he waived them. The trial court did not err in allowing the appellant's statements to be admitted.

II.
The appellant argues that the trial court erred in not granting his motion to suppress evidence gathered pursuant to a search conducted after his questioning by the police because, he says, his confession was illegally obtained. Because we have already held that the appellant was properly informed of his rights before the incriminating statements that led to the discovery of the evidence were made, we also conclude that the evidence gathered by the police as a result of the statements was properly admitted by the trial court. See, Jones v. State, 362 So.2d 1303, 1314-1315 (Ala.Cr.App.1978) (holding that evidence gathered as a result of a statement given during a legal arrest and interrogation was admissible, even though the defendant had alleged he was incapable of waiving his rights and that he was coerced into making his confession.) The appellant's argument with regard to this issue is without merit.

III.
The appellant argues that the trial court erred in not granting a mistrial after the prosecutor requested permission for the victim's *219 family to be excused from the courtroom before photographs of the victim were shown. The appellant contends that this request was a calculated effort to play on the sympathy of the jurors and to emphasize the photographs of the crime scene.
A party must show a high degree of necessity for a motion for a mistrial to be granted. "A motion for mistrial implies a miscarriage of justice and should only be granted where it is apparent that justice cannot be afforded." Dixon v. State, 476 So.2d 1236, 1240 (Ala.Cr.App.1985); Young v. State, 416 So.2d 1109 (Ala.Cr.App.1982). "A trial judge is allowed the exercise of broad discretion in determining whether a mistrial should be declared, because he is in the best position to observe the scenario, to determine its effect upon the jury, and to determine whether the mistrial should be granted." Dixon at 1240; Elmore v. State, 414 So.2d 175 (Ala.Cr.App.1982.)
The prosecutor's request for permission to let the victim's family leave before photographs of the victim were introduced clearly cannot be interpreted as a miscarriage of justice. There is nothing in the record to support the appellant's claim that this was a calculated effort to play on the sympathy of the jurors or an attempt to make the jurors give greater attention to the photographs than they would have had the prosecutor's request not been made. In any event, the prosecutor's statement did not prejudice the appellant to the degree necessary for a mistrial. The trial court committed no error in denying the appellant's motion for a mistrial.

IV.
The appellant argues that the trial court erred in denying his Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986) motion which alleged that the State used its peremptory strikes in a racially discriminatory manner. His Batson challenge is based on four strikes by the State of black veniremembers.
After the appellant made his Batson motion, the court ruled that a prima facie case had been made. After explanations for the challenged strikes were given by the State, the court ruled that the State's reasons for those strikes were race-neutral and denied the motion.
Once it has been determined that a prima facie case of discrimination has been established, the burden falls upon the proponent of the challenged strike to "articulat(e) a clear, specific, and legitimate reason for the challenge which relates to the particular case to be tried and which is nondiscriminatory." Ex parte Branch, 526 So.2d 609, 623 (Ala. 1987) (emphasis in original); Millette v. O'Neal Steel, Inc., 613 So.2d 1225, 1229 (Ala. 1992). The State gave the following reasons for the challenged strikes:
"MRS. MOQUIN [prosecutor]: With regard to juror 55, [S.D.], he stated that he was uncertain about the death penalty and had mixed feelings associated with it. In combination with that, he stated that he was uncertain, showed uncertainty, with regard to the burden of proof that the defense has with regard to the sanity issue. He stated that he was skeptical about accomplice testimony. I noticed that he is a Missionary Baptist and also a friend to a remaining juror, [Ms. J.] that's still remaining on the jury. For those reasons, Your Honor, I struck him.
"THE COURT: All right.
"MRS. MOQUIN: With regard to [B.M.], number 68, I noticed from his information on his questionnaire, that he had studied for the ministry and divorced and that he rents his home. Because he has studied for the ministry, it is my understanding that he may be persuaded to vote against the death penalty because of some religious affiliations he might have from the study of ministry, might be more sympathetic to the issues of the defense, because he has been tied in the past to a religious study. He is divorced, and he rents his home, which shows to me he is of somewhat unstable background. He has been convicted of assault which was shown on his questionnaire. He was convicted of an assault previously and also, Your Honor, I noted he was Baptist and as a result of that, in combination with the study of the *220 ministry, I felt he would not be a good juror for the state.
"THE COURT: Go ahead.
"MRS. MOQUIN: Number 64, [E.J.], my records show that he has been convicted of uttering obscene or lewdhe was convicted of either [making] obscene or lewd statements or obscene or lewd conduct previously, which he did not indicate on his questionnaire. Which shows to me he either selectively forgot that or he is lying to us when he answered his questionnaire. He did admit he had been convicted of public drunkenness in Limestone County, which I did not show on my records.
"THE COURT: How is that shown?
"MRS. MOQUIN: In his questionnaire he admitted he was.
"THE COURT: Very well.
"MRS. MOQUIN: And he was uncertain of the death penalty and [had] mixed feelings in association therewith.
"THE COURT: All right..
"MRS. MOQUIN: With regard to number 93, [F.W.], he stated he was uncertain on the death penalty, in that as the court made clear to me, that he would not vote for it if the issue of the death penalty was placed on some type of ballot for him to vote on, which indicated to me that he had mixed feelings in association with the death penalty and therefore might not vote for the death penalty. He has been a juror. He indicated on his questionnaire he had been a juror in a prior criminal case and had voted that person not guilty, he was convicted of DUI in 1987 and previously consulted with Mark McDaniel[1] with regard to some legal issue. For all those reasons, Your Honor, we struck those jurors."
(R. 182-184.)
The record reflects that the State struck juror number 55 because he had expressed reservations concerning the death penalty. "`That a veniremember has reservations about the death penalty, though not sufficient for a challenge for cause, may constitute a race-neutral and reasonable explanation for the exercise of a peremptory strike.'" Fisher v. State, 587 So.2d 1027, 1036 (Ala.Cr.App.) cert. denied, 587 So.2d 1039 (Ala.), cert. denied, 503 U.S. 941, 112 S.Ct. 1486, 117 L.Ed.2d 628 (1992), quoting Smith v. State, 531 So.2d 1245, 1247-48 (Ala. Cr.App.1987); see also Walker v. State, 611 So.2d 1133, 1135 (Ala.Cr.App.1992). The court did not err in allowing this strike.
The State's reasons for striking juror number 68 were that he had a past assault conviction and that he had studied for the ministry. "We have repeatedly held that a veniremembers's connection with or involvement in criminal activity may serve as a race-neutral reason for striking that veniremember." Wilsher v. State, 611 So.2d 1175, 1183 (Ala.Cr.App.1992). In addition, the fact that number 68 had studied for the ministry concerned the State with regard to his views on the death penalty. The fact that a veniremember is a preacher, pastor, or minister may constitute a sufficient reason for a preemptory strike. Fisher, 587 So.2d at 1037. Although the veniremember's prior assault conviction is a much more legitimate reason for striking him than the other, both reasons given by the State are sufficiently clear, specific, and race-neutral to support our affirmance of the trial court's decision with regard to juror number 68.
The State's reasons for striking veniremember number 64 were that he had been convicted for some type of obscene conduct in the past and that he was uncertain of his feelings with regard to the death penalty. As already noted, both reasons are sufficient support for the trial court's decision with regard to this juror. Additionally, his lack of candor in answering the jury questionnaire is a sufficiently race-neutral reason for the State's strike.
Veniremember number 93 expressed doubts about the death penalty and had a prior conviction for driving under the influence. Additionally, he had consulted defense counsel with regard to a legal issue in the past and had also served on a prior jury that had returned a verdict of not guilty. Again, *221 the State's reasons for striking this juror are clear, specific, and race-neutral.
We hold that the trial court did not err in denying the appellant's Batson motion.

V.
The appellant argues that the trial court erred by overruling his objection to the State's asking the venire for a "commitment" during the voir dire examination.
The following exchange from the record is relevant.
"MRS. MOQUIN [Prosecutor]: Okay now, the Statelet me ask this this way, how many of you have not heard the phrase `beyond a reasonable doubt'? I think every one of you [has] heard that phrase before and you understand in criminal cases the State carries the burden of proving beyond a reasonable doubt the elements of the crime. Are we all settled that that's the law? This is a capital case. Does anyone think that our burden of proof beyond a reasonable doubt in a capital case is not high enough? Do you believe that perhaps the State would have to prove it to you to some type of mathematical certainty, or beyond all doubt or beyond a shadow of a doubt? Would any of you make that burden higher on the State? Okay, I am going to ask for a commitment from you in that regard. Would you all agree not to hold the State to any higher burden than the law puts on the State, which is beyond a reasonable doubt? Do I have a commitment
"MR. BURGESS [defense counsel]: I object to her asking for a commitment from the jury.
"THE COURT: Overruled."
(R. 109-10.)
The appellant alleges that these were hypothetical questions that may have elicited a promise to return a guilty verdict and a recommendation of the death penalty. However, neither allegation is substantiated by the record. The questions went directly to the burden of proof that the jurors would apply to the evidence presented by the State in a capital case. "[I]n the exercise of peremptory strikes, either party has the right, within the trial court's discretion, to examine jurors on any matter which might tend to affect their verdict." Arthur v. State, 472 So.2d 650, 658 (Ala.Cr.App.1984), rev'd on other grounds, 472 So.2d 665 (Ala.1985); Ex parte Ledbetter, 404 So.2d 731 (Ala.1981). "Questions concerning jurors' attitudes about capital punishment are not limited to those questions which would elicit information which would constitute grounds of a challenge for cause." Arthur, 472 So.2d at 658; Brown v. State, 288 Ala. 684, 685, 264 So.2d 553, 554 (1972).
The questions asked by the State all were directed at informing the veniremembers attitudes regarding the proper standard of proof. There was no attempt to elicit a promise of a guilty verdict or a death penalty recommendation. Accordingly, the questions were proper and the trial court did not err in allowing them.

VI.
The appellant contends that the trial court erred in admitting photographs of the victim's body at the crime scene because, he says, they were unduly prejudicial, had no probative value, and were cumulative. This argument is without merit.
"Generally, gruesome photographs of a victim's body are admissible into evidence in a criminal prosecution if they are correctly identified and authenticated and: (1) tend to shed light on, (2) strengthen, or (3) illustrate the truth of other testimony. Additionally, they are admissible if they have a reasonable tendency to prove or disprove some material fact or issue in the case. Lewis v. State, 339 So.2d 1035, 1037 (Ala.Cr.App.), cert. denied, 339 So.2d 1038 (Ala.1976)."
Adkins v. State, 600 So.2d 1054 (Ala.Cr.App.1990), cert. denied, 600 So.2d 1072 (1992).
Also, photographs that depict the character and location of external wounds on the victim's body are admissible even if they constitute cumulative evidence of an undisputed matter. Hines v. State, 365 So.2d 320, 321 (Ala.Cr.App.), cert. denied, 365 So.2d 322 (Ala.1978); Lovett v. State, 491 So.2d 1034, 1035 (Ala.Cr.App.), cert. denied, 491 So.2d *222 1039 (Ala.1986). Moreover, the admission of photographs in a criminal prosecution is within the sound discretion of the trial judge. Magwood v. State, 494 So.2d 124 (Ala.Cr. App.1985), aff'd, 494 So.2d 154 (Ala.1986), cert. denied, 479 U.S. 995, 107 S.Ct. 599, 93 L.Ed.2d 599 (1986); Holland v. State, 424 So.2d 1387 (Ala.Cr.App.1982).
The record shows that these photographs corroborated the testimony of State's witnesses as to the condition of the crime scene and the nature and extent of Ms. McClure's wounds. There was no showing that the photographs were cumulative in nature. The trial court did not abuse its discretion in admitting the photographs into evidence.

VII.
The appellant contends that the trial court erred in allowing Charleen Bottorff to testify that the appellant would plan what she and Scott Carpenter would do when they were all together and that she was afraid of appellant. The relevant portions of the record read as follows:
"Q [By Mrs. Moquin, prosecutor]: Charleen, there are people who are leaders and people who are followers. Is Shane Click a leader or a follower?
"MR. McDANIEL [defense counsel]: We object to that, Judge.
"THE COURT: I sustain.
"Q: Charleen, in the times that you have been around Shane Click, who decided what you all would be doing?
"MR. BURGESS: I object to leading, Your Honor.
"THE COURT: Overruled.
"A: Shane, at times.
"Q: Did you do what you were asked by Shane Click?
"A: We all agreed, but we all did things, yes ma'am.
"Q: What do you mean by that?
"A: Well, he usually came up with the ideas, but most of the time we usually agreed and we would do things.
"Q: Is there any reason why you would agree?
"MR McDANIEL: We object to that.
"THE COURT: Overruled.
"Q: You can answer.
"A: We would enjoy the ideas he thought of at the time.
"Q: Pardon?
"A: Like play pool and we enjoyed that and it sounded like a cool idea, so we would go. It was something to do.
"Q: Did Shane Click tell you to do something you didn't want to do?
"A: I didn't want to go to his grandparent's house fourth of July.
"Q: Did you go?
"A: Yes.
"Q: Do you know whether or not Shane Click told Scott Carpenter to do things in your presence that he did not want to do?
"MR. BURGESS: We object to that.
"THE COURT: I sustain."
"....
"Q: Were you afraid of Shane Click at that time?
"A: I don't think I was afraid of him. He was more intimidating.
"Q: And what do you mean by the difference between intimidating and afraid?
"A: I was not afraid he would hurt me, but mostly it waswe argued, you know, and I was afraid to do that. I didn't want to argue or get in a confrontation with him.
"Q: Why?
"MR. McDANIEL: We object. Immaterial and irrelevant.
"THE COURT: Overruled.
"Q: Go ahead.
"A: He is bigger than me and more powerful. I just didn't want to."
(R. 325-26, 330.)
The appellant argues that whether he decided what Charleen Bottorff and Scott Carpenter did while they were with him or whether he made them do things they did not want to was immaterial and irrelevant. The State prosecuted the appellant on a theory of complicity. The evidence tended to show that Scott Carpenter was the only person who struck the victim with the baseball *223 bat. The State's theory of the appellant's case was that he rendered assistance in the victim's death through acts, words, encouragement, or support. In short, the State sought to prove that the appellant was a very persuasive person who masterminded the plot to kill Ms. McClure and convinced his friends to help him.
Under the test for relevancy employed in Alabama, "a fact is admissible if it has any probative value, however slight, upon a matter in the case." Jennings v. State, 513 So.2d 91, 97 (Ala.Cr.App.1987), citing C. Gamble, McElroy's Alabama Evidence § 21.01(1) (3d Ed.1977). "`"The determination of the relevancy of a particular item of evidence is left to the sound discretion of the trial judge and this court will not reverse unless that discretion has been ... abused."'" Jenkins v. State, 627 So.2d 1034, 1044 (Ala.Cr.App.1992) aff'd, 627 So.2d 1054 (Ala.1993), cert. denied, 511 U.S. 1012, 114 S.Ct. 1388, 128 L.Ed.2d 63 (1994), quoting Jennings v. State, 513 So.2d 91.97 (Ala.Cr. App.1987), quoting, in turn, Wicker v. State, 433 So.2d 1190, 1198 (Ala.Cr.App.1983). The court committed no error here.
The appellant's argument that the questions in the above-quoted portion of the record amounted to prosecutorial misconduct and that the cumulative effect of those questions prejudiced him is also without merit.

VIII.
The appellant argues that the trial court erred in permitting, during the guilt phase of trial, Dr. Lawrence Maier to state his opinion of the appellant's mental condition at the time of the commission of the offense. The appellant argues that Dr. Maier relied on information he received from others and was not in evidence to reach his opinion. We find that no such error occurred.

A.
The appellant objected to Dr. Maier's testimony that he had talked with Dr. Preston, who saw the appellant on the day of the murder, in order to get his impressions of the appellant on that day. When Dr. Maier was subsequently asked whether he had relied on this conversation with Dr. Preston, he replied that he had not. (R. 1062.)
However, even if Dr. Maier had relied on his conversation with Dr. Preston, there would have been no error in allowing into evidence an opinion based on this conversation. The Alabama rule is that a medical expert may give an opinion based in part upon the opinions of others, when those other opinions are found in medical records admitted into evidence. Ex parte Wesley, 575 So.2d 127, 128 (Ala.1990); Nash v. Cosby, 574 So.2d 700 (Ala.1990). "There is no reversible error if the facts upon which the opinion is based are admitted into evidence after the expert has testified. Ex parte Wesley at 129; Crawford v. Hall, 531 So.2d 874 (Ala.1988). The record reflects that Dr. Preston later testified to the same facts as those upon which Dr. Maier allegedly relied. (R. 1106-43.) Accordingly, even if Dr. Maier relied on his conversation with Dr. Preston, the court did not err in allowing Dr. Maier's opinion testimony.

B.
The appellant also argues that Dr. Maier improperly relied on the impressions of jail personnel when forming his opinion of the appellant's condition at the time of the murder. Dr. Maier had spoken with jail personnel to learn about the appellant's behavior subsequent to his arrest. When specifically asked whether he had relied on the statements of jail personnel to form his opinion as to whether the appellant knew what he was doing on the night of the murder, Dr Maier replied:
"No. That source of data was more relevant to the mental condition of the defendant while incarcerated. And of course, almost by definition that means after the crime."
(R. 1049.)
Dr. Maier offered no opinion during the guilt phase of the trial as to the appellant's mental state while he was incarcerated. He testified only to his opinion of the appellant's mental state at the time of the crime and he waived his Miranda rights. The court did *224 not err in admitting Dr. Maier's expert opinion.

C.
In his brief to this court, the appellant argues that Dr. Maier improperly relied on police reports and on his codefendant's statements in arriving at his opinion. However, these issues were not preserved for appeal because the appellant failed to raise a specific and timely objection to Dr. Maier's testimony on this ground at trial.
A specific objection by trial counsel is necessary to preserve error for appellate review. Reeves v. State, 456 So.2d 1156 (Ala.Cr.App.1984). Additionally, the statement of specific grounds of objection waives all grounds not specified, and the trial court will not be put in error on grounds not specified at trial. Moss v. State, 545 So.2d 230, 231 (Ala.Cr.App.1989).
The appellant timely objected to Dr. Maier's basing his opinion upon information received from Dr. Preston and jail personnel, but any objection to his basing his opinion on police reports or statements of a codefendant was not preserved for appeal because no specific objection on this ground was made at trial.

IX.
The appellant argues that the trial court erred in overruling his motion to strike Dr. Maier's testimony concerning whether the appellant knew the difference between right and wrong when he committed the crime. The following testimony from the record is relevant to this argument:
"Q: [By Mrs. Moquin, prosecutor]: All right, sir. Based on the items you have designated to us, that you used to form that opinion, do you also have an opinion as to whether or not the intoxication from any of the substances that he outlined to you prevented him from knowing the nature and quality or wrongfulness of his act on that night?
"A: [By Dr. Maier]: It affected his judgment, but it did not affect his basic understanding of the difference between right from wrong.
"MR. BURGESS [defense counsel]: May we approach the bench?
"THE COURT: Yes, sir.
"(The following occurred outside the hearing of the jury:)
"MR. BURGESS: We object to that statement and move the court to direct the jury to disregard it for the reason the ability the statement between right and wrong is not the legal test for individuals excused from behavior due to mental defect or disease. The standard is whether he is unable to appreciate the quality and nature of, as a consequence of the mental illness, not the difference between right and wrong.
"THE COURT: Overruled. He can state his opinion. It may not be helpful, but he can state the opinion. That isthat is not the only opinion he has."
(R. 1051-52.)
The appellant's argument is without merit. Although the witness did not state the correct legal definition of insanity, his opinion as to whether the appellant knew the difference between right and wrong at the time of the killing is not due to be stricken solely for this reason. Dr. Maier's opinion was relevant to the State's contention that the appellant knew what he was doing at the time of Ms. McClure's death. The trial judge is responsible for instructing the jury on the applicable law in a case, and in the instant case the trial judge's instructions on the defense of insanity were adequate. (R. 1237-39).

X.
The appellant argues that the trial court abused its discretion in allowing the State to ask Dr. Maier whether intoxication would have prevented the appellant from appreciating the nature and quality or wrongfulness of his actions on the night Ms. McClure was killed. The following exchange occurred during the guilt phase of the trial:
"Q [By Mrs. Moquin, prosecutor]: Doctor, let me ask you this, again, the intoxication, if any, on the night in question, based on what you have told us so far that *225 you based your opinion on, have you formed an opinion as to whether or not that intoxication prevented Jimmy Shane Click from appreciating the nature and wrongfulness of his actions that night?
"MR. BURGESS: That is not the proper standard for consideration of the involuntary intoxication.
"THE COURT: Overruled."
(R. 1052.)
The record reflects that the State asked this question a short time after the appellant's counsel asked Dr. Merikangas several lengthy hypothetical questions designed to elicit his opinion as to whether the appellant was competent at the time of the murder and when he waived his Miranda rights. At least two of these questions related to whether any drugs allegedly consumed by the appellant affected his mental condition. (R. 991, 1006-07.) The State contends that the question to which appellant objects was asked in rebuttal.
The objection, however, was not that the question was improper, but that it stated the improper standard for of the defense of involuntary intoxication. There is no evidence in the record to suggest that the appellant was involuntarily intoxicated at the time of the murder and at the time he waived his rights. The appellant contended that he had been using "street drugs" on a daily basis for some months before the murder. There is no indication that he was forced or compelled to use drugs on the day of the murder.
This argument, in any case, is moot. If anything, the State's question regarding intoxication stated a less stringent standard for an intoxication defense than the law currently imposes. Voluntary intoxication, or intoxication caused by substances that the actor knowingly introduces into his body, the tendency of which is to cause intoxication he ought to know, is not a defense to a criminal charge. § 13A-3-2 Code of Alabama 1975. "Mere drunkenness, voluntarily produced, is never a defense against a criminal charge and can never palliate or reduce the grade of an offense, unless it is so extreme as to render impossible some mental condition which is an essential element of the criminal act." Gautney v. State, 284 Ala. 82, 88, 222 So.2d 175, 181 (1969).
Whether the appellant's intoxication was voluntary or involuntary was not the issue the witness was asked to address. Dr. Maier was asked to give his opinion as to whether the appellant's intoxication could have exacerbated his mental illness. The appellant objected to the form of the question with regard to the standard for intoxication. We find that the appellant's argument relating to the standard for the defense of intoxication is not preserved for review because it was not raised at an appropriate time.

XI.
The appellant argues that the trial court erred in denying his motion for a judgment of acquittal because, he says, there was insufficient corroboration of the testimony of the accomplice, Charleen Bottorff. This argument is without merit.
This argument assumes that the statements given by appellant to police investigators and the physical evidence subsequently gathered as a result of those statements were improperly introduced into evidence. Based on this assumption, the appellant contends that Ms. Bottorff's testimony was the only incriminating evidence that the jury could consider.
However, because we have held that the introduction of the appellant's statements and the physical evidence was proper, there is ample evidence to corroborate Ms. Bottorff's testimony and to satisfy the requirements of § 12-21-222, Code of Alabama 1975, which requires that an accomplice's testimony in a felony case be corroborated by other evidence. Additionally, the testimony of Shawn Sato, a friend of the appellant's who testified that he helped the appellant hide some of the items used in the killing, was incriminating. (R. 760-809.) The trial court correctly denied the appellant's motion for a judgment of acquittal on this ground.

XII.
The appellant argues that the trial court abused its discretion in admitting photographs of the victim's body that were taken *226 during the autopsy. The appellant contends that the gruesome nature of the photographs prejudiced the jury.
As we have already ruled with regard to the crime scene photographs in Part VI of this opinion, the fact that pictures are gruesome does not render them inadmissible if there is a legitimate purpose for their introduction. The autopsy photographs were introduced to corroborate the testimony of Dr. Joseph Embry, the state medical examiner who performed the autopsy. The photographs to which the appellant objects corroborated testimony as to the character and location of the victim's wounds. The trial court committed no error in admitting these photographs.

XIII.
The appellant alleges that the trial court erred by allowing investigators to testify as to his mental state at the time he made his statements. However, he has failed to preserve this issue for appeal. The following portions of the record are relevant with regard to this issue. The first two segments occurred during the State's direct and re direct examination of Investigator Wayne Sharp and the third occurred during the state's direct of Investigator Howard Turner.
"Q [By Mrs. Moquin, prosecutor]: Let me ask you at this point, Wayne and ask you this, during the period of time that you had Shane Click in your office and talking with him, did he appear to lose the ability to talk to you in any way?
"MR. BURGESS: I object to what he appeared to lose.
"THE COURT: Overruled." (R. 491.)
"Q: Was there any time when you were with him when he appeared to you to lose touch with reality, not know where he was, oriented in time and space?
"MR. MCDANIEL: We object, Judge.
"THE COURT: Overruled." (R. 499.)
"Q: Did you ever see him lose any type of ability to know where he was or what was going on around him?
"MR. BURGESS: Objection.
"THE COURT: Overruled." (R. 553.)
As we have already noted above, specific objections are necessary to preserve error for appellate review. Reeves v. State, supra. Each of the above objections failed to specify the legal grounds upon which they were based; therefore, this issue is not preserved for our review.

XIV.
The appellant contends that the trial court erred in overruling his objection to an allegedly improper leading question and then by failing to exclude what he argues was an unresponsive and prejudicial answer. His objection is based on the following testimony from the record, which took place during the State's direct examination of Investigator Wayne Sharp.
"Q [By Mrs. Moquin, prosecutor]: So they did not have permission, according to his statement, to enter the residence?
"MR. BURGESS: I object to that. That's an improper characterization of his testimony and it is the conclusion of Mrs. Moquin.
"THE COURT: Overruled. Don't lead your witness.
"Q: You can answer that question.
"A: No, apparently they did not have permission.
"MR. BURGESS: I object to that and move to exclude.
"THE COURT: I sustain."
(R. 684.)
The appellant first maintains in his brief to this court that the State's question should have been excluded because, he says, it was an improper leading question. The appellant's objection at trialthat the question was an improper conclusion of the prosecutorwas sustained after the witness answered and it was raised a second time. The argument that the question was improper as a leading question is not preserved for appeal *227 because the appellant did not make this objection at trial.
The appellant also argues that Investigator Sharp's testimony to the effect that the appellant did not have permission to enter the residence should have been excluded. The record shows that the trial judge failed to rule on the appellant's motion to exclude the answer of this witness.
"`An adverse ruling is a preliminary requirement to preservation of error for appellate review.... Absent an adverse ruling the issue of the objection is not properly before the court.'" Hudgins v. State, 615 So.2d 1297, 1299 (Ala.Cr.App.1993), quoting Van Antwerp v. State, 358 So.2d 782, 790 (Ala.Cr.App.), cert. denied, 358 So.2d 791 (Ala.1978). When an appellant fails to obtain an adverse ruling, the issue is not preserved for review. Breckenridge v. State, 628 So.2d 1012 (Ala.Cr.App.1993).

XV.
The appellant argues that the trial court erred in allowing Investigator Turner to testify as to whether he would talk to someone who was too intoxicated to talk to him. The appellant contends that what the investigator may have done on general occasions is immaterial to this case. We find that the trial court committed no error.
The appellant objects to the following portion of the questioning that occurred during the State's re-direct of Investigator Turner:
"Q [By Mrs. Moquin, prosecutor]: When would you, in your legalin your law enforcement experience, ask somebody if they're intoxicated or high on drugs?
"A: I don't know of any time I would ask them. I don't know.
"Q: Would it be based on your observation that you would not talk to somebody because they're too intoxicated to talk to you?
"MR. BURGESS [defense counsel]: I object to what he may do on general occasions; that doesn't necessarily mean what he would do on this occasion. She is leading the witness and it is not material to this case.
"THE COURT: Overruled.
"Q: You may answer.
"A: No, ma'am."
(R. 738.)
The State contends, and the record supports its contention, that during the cross examination of Investigator Turner immediately preceding the exchange to which the appellant objects, the appellant's counsel asked the following questions:
"Howard, if you arewhy do you make a determination or why do you make assessments as to whether someone is under the influence of alcohol or drugs when you're securing a statement from a suspect?"
(Emphasis added.) (R. 732.)
"[I]t could be a significant fact for you to know if someone was under the influence of controlled substances when they talked to you?"
(Emphasis added.) (R. 732.)
The appellant's argument that it is immaterial whether Investigator Turner would talk to a person who was highly intoxicated is without merit. Part of the appellant's theory of his defense was that his statement to police was involuntary because at the time he made the statement he was suffering from a mental illness and possible intoxication. The appellant's questions during Investigator Turner's cross-examination highlight this line of his defense. The State's question as to whether the investigator would talk to a highly intoxicated person was aimed at weakening this defense.
The appellant's contention that the State's question improperly led the witness is also without merit. The question did not suggest an answer one way or the other from Investigator Turner. No error was committed by the trial court in allowing the State to ask the question.

XVI.
The appellant argues that the trial court erred in allowing a lay witness to testify as to whether the appellant was smarter than his codefendant, Scott Carpenter. The appellant's objection took place during the state's re-direct examination of Shawn Sato:

*228 "Q [By Mrs. Moquin, prosecutor]: Of the two persons, who would you say was the smarter?
"MR. MCDANIEL: We object about mental operation, to testify about what these guys' I.Q. is.
"MRS. MOQUIN: He went to school with them. I think he can tell his opinion.
"A: Shane.
"Q: Was Shane much smarter than Scott?
"A: In my opinion, I would say, yes."
(R. 800-01.)
The appellant argues that the above testimony is improper, because, he says, it was an improper opinion relating to the mental status of another person.
"It is recognized generally that the mental status of another is a matter of opinion rather than fact. A witness therefore is precluded under the opinion rule from testifying that another did or did not know a certain fact or feel a certain way. The proper procedure for examining such a witness is to have him detail the facts from which such a conclusion of knowledge or feeling could be drawn by the trier of fact."
C. Gamble, McElroy's Alabama Evidence, § 128.08 (4th ed.1991). However the witness was not testifying that the appellant knew of any certain facts or had any particular feelings. The witness was simply giving his opinion that the appellant was smarter than his codefendant.
With regard to this opinion testimony, the State had laid substantial foundation with this witness for it. Before the testimony quoted above, Sato testified that he and the appellant had known each other for about nine years, that he considered the appellant to be one of his best friends, and that they had been around each other on a daily basis for almost all of that time. (R. 761-63.) Sato also had testified that he knew Scott Carpenter, that they went to the same school, that he saw Carpenter about as often as he saw the appellant, and that Carpenter had repeated at least one grade in school because of bad grades. (765-66.) The trial court did not abuse its discretion in determining that the witness was qualified to give his opinion as to which of the codefendants was smarter based on his personal knowledge of them.

XVII.
The appellant argues that the trial court erred in excluding testimony of his mother, Cathy Lambert, that he had been diagnosed as suffering from a mental illness on the basis that it was hearsay. On several occasions during the appellant's direct examination of Mrs. Lambert, the State's hearsay objections were sustained. These occasions are quoted from the record below.
"Q[By Mr. Burgess, defense counsel]: Was there any kind of counsel with doctorMr. Smith?
"A: Mr. Pierce?
"Q: I am sorry, Dr. Pierce.
"A: I made an appointment with Shane and he interviewed Shane and after he interviewed Shane, he interviewed me and told me that he
"MRS. MOQUIN: We object to what he told her as hearsay.
"THE COURT: You're speaking ofwho is speaking now?
"A: Dr. Pierce.
"THE COURT: I sustain." (R. 827.)
"Q: Would you please tell the ladies and gentlemen of the jury what drugs he was taking?
"A: He was medicated once at Mountain View with Thorazine for an incident that occurred there.
"MRS. MOQUIN: We object to what he was medicated for.
"THE COURT: I sustain." (R. 831.)
"Q: And how did you come to know what mental illness he was diagnosed as suffering from?
"MRS. MOQUIN: We object, hearsay again.
"THE COURT: I sustain." (R. 833.)

*229 "Q: And did you come to learn that he was diagnosed as having had a psychotic episode?
"MRS. MOQUIN: We object to what his diagnosis was.
"THE COURT: I sustain." (R. 839.)
"Q: And what was the purpose? What is your understanding of the reason for the release?
"MRS. MOQUIN: We object to her understanding of the release.
"THE COURT: Sustain." (R. 856.)
"Q: Was there some change made in the medication in May or June of 1992?
"A: Yes, the psychiatrist changed again and changed to Dr. James Hancock, and he began to move the medication slowly. He introduced Clonopin, I believe, Tegretol, some other drugs and finally he said to me, I think he needs'
"MRS. MOQUIN: I object to what
"THE COURT: I sustain." (R. 860.)
The appellant contends, for the first time on appeal that the testimony to which the State objected as hearsay was elicited for some other purpose than to prove the truth of the matter asserted and that, therefore, it was not hearsay and the trial court should not have sustained the objections. The appellant should have established at trial the reasons that the testimony would have been admissible. See Standridge v. Alabama Power Co., 418 So.2d 84, 88 (Ala.1982) (holding that the burden was on the party introducing the evidence to show that it is admissible under some exception to the hearsay rule). We hold that the trial court properly sustained the State's objections.

XVIII.
The appellant argues that the trial court erred in allowing the State to ask a defense witness a question about a newspaper article without giving the witness the publication date of the article and the method by which the article was disseminated.
The following exchange occurred during the State's cross-examination of Dr. James Merikangas:
"Q [By Mrs. Moquin, prosecutor]: Are you aware that there was an article in the newspaper, in the `Dear Abby' report, where people had had dental surgery done that they were actually receiving radio transmissions through their fillings, sir? "MR. BURGESS [defense counsel]: I object to that unless she is going to state a time or reference point for anything in `Dear Abby' and when it was published and how it was disseminated.
"THE COURT: Overruled."
"A: I read `Dear Abby' frequently and am aware of that."
(R. 1024.)
The appellant argues that the question propounded by the State was vague, uncertain, or ambiguous. We disagree. The question called for a yes or no answer. The witness, apparently knowing what the question referred to, answered affirmatively. We also must note that attorneys are given wide latitude in posing questions during cross examination. Harris v. State, 632 So.2d 503 (Ala.Cr.App.1992), aff'd, 632 So.2d 543 (Ala. 1993), aff'd, 513 U.S. 504, 115 S.Ct. 1031, 130 L.Ed.2d 1004 (1995); Mallett v. State, 594 So.2d 1297 (Ala.Cr.App.1991). The error, if any, in allowing the prosecutor to ask the question was harmless. However, there was no error by the trial court in allowing this question.

XIX.
The appellant argues that the trial court erred in overruling his objection to testimony by Dr. Preston concerning Dr. Preston's opinion of appellant's mental state at the time he saw the appellant on July 24, 1990. During the State's direct examination of Dr. Preston, the following testimony was given:
"Q [By Mrs. Moquin, prosecutor]: Dr. Preston, I need to know if you formed an opinion as to whether or not he could appreciateif there was any kind of a mental illness that prevented him from *230 being able to appreciate the nature or quality or wrongfulness of his actions on that night in question. Have you formed an opinion about that, sir?
"A: Yes.
"Q: And is it based on the litany of information that you provided to us thus far?
"A: Yes.
"Q: And what is that opinion?
"MR. BURGESS [defense counsel]: Object, Your Honor.
"THE COURT: Overruled.
"A: My opinion regarding that is there was no mental illness that would have compromised his mental status at the time that I saw him, unless he had perhaps been under the influence of some sort of psycho active substances, illegalillegal substances.
"Q: All right, sir.
"MR BURGESS: We move to strike his response as beingcompromised him when I saw him,' is not responsive to the question and move the jury be instructed to disregard [his testimony].
"THE COURT: I will overrule it on the Nichols v. State, [276 Ala. 209, 160 So.2d 619 (1964)] that gives both sides a lot of latitude where insanity is pleaded as a defense. Overruled."
(R. 1126-27).
The appellant's objection at trial was to the unresponsiveness of Dr. Preston testimony as appellant's mental state at the time he saw him when he was asked to give an opinion of the appellant's state of mind at the time of the murder. The appellant argues for the first time in brief to this court that the portion of Dr. Preston's testimony should have been excluded for reasons other than as nonresponsive. This issue, however, was not preserved for appeal. A statement of specific grounds waives all grounds not specified, and the court will not be put in error on grounds not assigned at trial. Ex parte Frith, 526 So.2d 880, 882 (Ala.1987).

XX.
The appellant argues that the State committed prosecutorial misconduct during its closing argument when the prosecutor referenced the handling of Charleen Bottorff's case. Additionally, the appellant argues that the court erred in allowing the prosecutor to tell the jury to write her boss if they did not like the way Mrs. Bottorff's case was handled.

A.
The appellant contends that the fact that another prosecutor had made the ultimate decision regarding the handling of the criminal case against Ms. Bottorff was not properly in evidence at the time Mrs. Moquin made her comment. However, this contention is without merit. The record reflects that the appellant himself introduced the subject during his cross-examination of Ms. Bottorff. We quote:
"Q [Mr. McDaniel, defense counsel]: Do you know who James Roy Accardi is?
"A: Assistant District Attorney.
"Q: Is he the one in charge of prosecuting your case?
"A: I don't know.
"Q: Have you ever had a conversation or meeting with Mr. Accardi and your lawyer present?
"A: Yes sir.
"Q: You went to Mr. Jim Accardi's office, the Assistant District Attorney, the one in charge with prosecuting your case along with Jamie Butler and gave them a statement?
"A: Yes sir." (R. 335-36.)
"Q: All right, fine. There have been no promises expressed or implied made by the State regarding any recommended sentence, is that right?
"A: Yes, sir.
"Q: And done in February of 1992, correct?
"A: Yes.
"Q: Signed by Mr. James Roy Accardi, correct?
"A: Yes, sir." (R. 338.)
The fact that another assistant District Attorney was handling Bottorff's case was *231 properly in evidence at the time of the prosecutor's comment during closing arguments.

B.
The appellant's contention that the prosecutor made an improper and prejudicial statement to the jury was not preserved for review. The appellant objects to the following statement made by Mrs. Moquin during the State's closing arguments:
"Write a letter to my boss. Tell my boss if you don't like those types of deals being made." (R. 1174.) The appellant voiced no objection to this remark during trial. When no objection is made following a prosecutor's allegedly objectionable remark, a claim of error based upon improper argument of counsel is not preserved for appellate review. Lee v. State, 562 So.2d 657, 666 (Ala.Cr.App.1989); Thomas v. State, 622 So.2d 415 (Ala.Cr.App.1992), cert. quashed, 622 So.2d 420 (Ala.1993).

XXI.
The appellant argues that the trial court erred in overruling his objection that the prosecutor incorrectly stated some facts during the State's closing argument and that it was improper for the prosecutor to argue that it looked to her like the appellant was doing "street drugs" before he knew the victim.

A.
Mrs. Moquin, the prosecutor for the State, incorrectly stated during closing arguments that the only evidence of the victim's selling drugs to the appellant came from the appellant's attorney. In fact, Shawn Sato had testified as to that fact. (R. 1211, 795-96.) After overruling the appellant's objection, the trial judge stated that he would "let the jury remember what the evidence was." (R. 1211.) The trial court had informed the jury that statements of counsel during closing arguments were not to be considered as evidence and that if an attorney stated the facts in a way different from the jurors' recollection the jurors' recollection should prevail. (R. 1161.) The trial court's jury charge also adequately informed the jurors that they were the sole triers of the facts of the case. (R. 1223.)
"In order for a prosecutor's comments made during argument before the jury to require a new trial, the entire trial must have been so infected with unfairness as a result of these comments that the appellant was denied due process." Darden v. Wainwright, 477 U.S. 168, 181, 106 S.Ct. 2464, 2471, 91 L.Ed.2d 144 (1986); Hart v. State, 612 So.2d 520, 527 (Ala.Cr.App.1992), aff'd, 612 So.2d 536 (Ala.1992), cert. denied, 508 U.S. 953, 113 S.Ct. 2450, 124 L.Ed.2d 666 (1993). Any prejudice that might have resulted from the prosecutor's statement was dispelled by the trial court's instructions. Accordingly we hold that the court did not err in overruling the appellant's objection.

B.
The appellant also argues that the prosecutor's statement that it looked to her like he had been doing "street drugs" long before he knew the victim was improper and that the trial court erred in allowing it. The appellant contends, and the record reflects, that he was eight years old when he first met the victim. (R. 834.) However, the record also reflects that appellant never objected to this remark during the trial. This issue is therefore not preserved for appellate review. Lee v. State, 562 So.2d 657 (Ala.Cr.App.1989). Had the argument been properly preserved, the instructions to the jury from the trial court would have cured any error caused by this remark.

XXII.
Appellant argues that the trial court erred in denying his motion to bar the State from seeking the death penalty and to bar the death qualification of the jury. The appellant claims that the prosecution's election to seek the death penalty was arbitrary and discriminatory because, he says, the death penalty was not sought against his two codefendants. We hold that the issue is moot because the appellant was sentenced to life imprisonment without parole. See, e.g. Beard v. State, 661 So.2d 789, 794 (Ala.Cr. App.1995); Fox v. State, 602 So.2d 484, 488 (Ala.Cr.App.1992).

*232 XXIII.
The appellant argues that the trial court erred by failing to grant his motion to dismiss Count I of the indictment. Count I charged appellant with murder in connection with a burglary in the second degree, a capital offense. The burglary portion of the count charged that the appellant had entered a dwelling with the intent to commit murder. The appellant alleges that this count should have been dismissed because it was vague, indefinite, and because, along with the other count, it violated the Double Jeopardy Clause of the Fifth Amendment to the United States Constitution.
The appellant's argument was rendered moot by the fact that the state elected to proceed against him on Count II of the indictment, and dismissed Count I. "Only the count upon which appellant was found guilty is subject to appellate review." Hammond v. State, 354 So.2d 280, 284 (Ala.Cr.App.), cert. quashed, 354 So.2d 294 (Ala.1977), cert. denied, 439 U.S. 823, 99 S.Ct. 91, 58 L.Ed.2d 115 (1978)

XXIV.
The appellant argues that the trial court erred in denying his motion for a judgment of acquittal because, he says, the great weight of the evidence proved that he was insane at the time of the offense. We find that the appellant failed to satisfy the high burden necessary to warrant our reversal of the judgment.
The defense of insanity in Alabama is covered by statute.
"(a) It is an affirmative defense to a prosecution for any crime that, at the time of the commission of the acts constituting the offense, the defendant, as a result of severe mental disease or defect, was unable to appreciate the nature and quality or wrongfulness of his acts. Mental disease or defect does not otherwise constitute a defense.
"(b) `Severe mental disease or defect' does not include an abnormality manifested only be repeated criminal or otherwise antisocial conduct.
"(c) The defendant has the burden of proving the defense of insanity by clear and convincing evidence."
§ 13A-3-1, Code of Alabama 1975.
"Every person over 14 years of age charged with a crime is presumed to be responsible for his acts, and the burden of proving that he is irresponsible is cast upon the accused. The defense of insanity in all criminal prosecutions shall be clearly proved to the reasonable satisfaction of the jury.
§ 15-16-2, Code of Alabama 1975.
Alabama caselaw has also set out other principles regarding the defense of insanity.
"`1. By statute, there is a presumption of sanity extending to all persons over the age of 14.
"`2. The defense of insanity is an affirmative defense. The burden of proving this defense rests upon the defendant and never shifts to the state.
"`3. The burden upon the defendant is to establish the issue of legal insanity by a preponderance of the evidence and to the reasonable satisfaction of the jury. [Now, under Ala.Code 1975 § 13A-3-1(c), "[t]he defendant has the burden of proving the insanity defense by clear and convincing evidence."]
"`4. The question of insanity at the time of the commission of the crime is a matter to be determined by the jury from consideration of all the evidence.
"`5. In making its determination, the jury may reject all expert testimony though it is without conflict.
"`6. However, opinion testimony, even of experts must be weighed by the jury and may not be arbitrarily ignored.
"`....
"`The one exception to these rules is found in those cases where the proof of insanity is overwhelming and uncontradicted.
"`"Cases of insanity may be so clear, the proof so strong and undisputed, that the jury should be instructed in like form." Boyle v. State, 229 Ala. 212, 222, 154 So. 575, 583 (1934).' *233 "Herbert v. State, 357 So.2d 683, 688-689 (Ala.Cr.App.[1978]) (Bracketed material added [in Dixon]), cert. denied, 357 So.2d 690 (Ala.1978.)"
Dixon v. State, 668 So.2d 65, 69-70 (Ala.Cr. App.1994).
"Although the evidence may be offered only by the defense, and all tend to one conclusion, yet, in view of the presumption of sanity, if the evidence is inconclusive, and reasonable inferences may be drawn that the act was that of a sane man as defined by law, the affirmative charge (of insanity) should be refused."
Boyle v. State, 229 Ala. at 222, 154 So. at 583.
Additionally, a two-part showing must be made by the defendant to meet the § 13A-3-1(a) test of insanity. "First, he must establish that he suffered from a serious mental disease or defect at the time of the crime. Second, his mental disease or defect must have prevented him from appreciating the nature and quality or wrongfulness of his acts." Ware v. State, 584 So.2d 939 (Ala.Cr. App.1991) (emphasis added), citing United States v. Knott, 894 F.2d 1119, 1121 (9th Cir.), cert. denied, 498 U.S. 873, 111 S.Ct. 197, 112 L.Ed.2d 158.

A.
The evidence that the appellant was suffering from a mental disease or defect at the time of the commission of the crime is uncontroverted. Indeed, there is ample documentation in the record of the appellant's irregular behavior as a child and of the complications of the mental defect for which he had been treated for almost a year before he was arrested for the murder of Ms. McClure. The appellant was first treated in the psychiatric ward of Mountain View Hospital from August 18 until September 28, 1989. This hospitalization occurred after his mother had become worried about his withdrawal and depression and had found suicide notes and wills that he had written. (R. 830-32.) His second commitment at Mountain View was from November 3 through November 7, 1989. This hospitalization occurred after the appellant came to dinner at his house wearing a black cape and hood, "became animalistic and primal as if he was being attacked" when his mother and stepfather attempted to talk to him, and subsequently ran to his room, where he loaded a shotgun and threatened to kill his stepfather if he approached him. (R. 838-40.) The record also reflected that appellant, in August 1989, told doctors treating him that he had been hearing the voice of what he referred to as "Is" for about seven years. He said that the voice told him to hurt himself and cursed him. (R. 903, 927-29.) During the period in which appellant was treated for mental illness, he was prescribed several drugs designed to treat chemical imbalances of the brain and to treat the side effects of his illness. Among these drugs were Lithium, Loxitane, Desipramine, Cogentin, and Norphenin. At the time of Ms. McClure's death, Dr. Preston was treating him for his mental illness.
Additionally, the record documents the extensive treatment given to the appellant subsequent to his arrest, his diagnosis as having a "schizo-affective" disorder, and his continued unusual behavior. The appellant satisfies the first requirement of the two-part test discussed in Ware, above.

B.
The appellant's contention that his mental illness prevented him from understanding the nature and quality or wrongfulness of his acts at the time of the commission of the crime and is the heart of the argument before us. The question is whether the appellant established that he was unable to so understand by clear and convincing evidence. For the reasons stated below, we find that the appellant failed to meet this burden.
Clear and convincing evidence has been defined by this court in D.D.P. v. State, 595 So.2d 528, (Ala.Cr.App.1991). We quote:
"`Clear and convincing evidence is most easily defined as the evidentiary standard that lies somewhere between a preponderance of the evidence and evidence probative beyond a reasonable doubt. Addington v. Texas, 441 U.S. 418, 423-24, 99 S.Ct. 1804, 1807-08, 60 L.Ed.2d 323 (1979).' Matter of K.A., 484 A.2d 992, 995 (D.C.App.1984). See generally 9 J. Wigmore, Evidence § 2498 (Chadbourn rev.1981); *234 E.Cleary, McCormick on Evidence § 340 (3rd ed.1984); 32A C.J.S. Evidence § 1023 (1964)."
The appellant's mother, Cathy Lambert, testified generally as to his mental illness and documented the treatment he had received both before and after his arrest. She testified that she believes that her son is mentally ill and that he was mentally ill in July 1990. (R. 863.)
The next witness to testify concerning the appellant's mental condition was Dr. James F. Pierce. Dr. Pierce testified that he had had contact with the appellant on three separate occasions during a week in July 1989. Dr. Pierce concluded that at that time the appellant was a serious suicide risk, noted in his record that the appellant was suffering "insipiant (sic) schizophrenia or schizophrenic process," and recommended his first hospitalization at Mountain View Hospital. (R. 903-912.) Dr. Pierce testified that he had had no contact with appellant subsequent to August 2, 1989. (R. 915.)
The appellant's next witness was Dr. David Rush, who began treating him in August 1990, after his arrest. Dr. Rush testified that he initially diagnosed the appellant as suffering from major depression with mood congruent disorders. (R. 924-25.) In his report to Judge Hartwell Lutz, who ordered the appellant's evaluation, Dr. Rush described the appellant as having a bipolar or manic depressive disorder. (R. 929.) Subsequent to an evaluation performed in August 1991, Dr. Rush diagnosed appellant as having "schizo-affective" disorder. (R. 931.) Dr. Rush also testified that the appellant has suffered from a severe mental illness since August 1989, and that his current treatment included the drug Clorazil, which is regarded as a treatment of last resort. (R. 931, 936-39.) Dr. Rush gave no opinion as to whether the appellant's mental condition prevented him from realizing the nature and quality or wrongfulness of his actions on July 24, 1990.
The appellant's final witness was Dr. James Merikangas, who testified that he saw appellant in January 1993. Dr. Merikangas confirmed the earlier diagnoses of the appellant's schizoaffective disorder and expressed his opinion that the appellant has suffered from a severe mental disease since he was eight years old. (R. 968, 972.) Dr. Merikangas also testified that, based on his meeting with the appellant and his review of the appellant's medical records from before and after his arrest, and based on information that appellant had been using drugs such as marijuana, cocaine, and LSD on a regular basis during the spring and summer of 1990, the appellant was suffering from a severe mental disease or defect on July 24, 1990. Dr. Merikangas further stated that because of this mental disease or defect, the appellant could not understand the nature and quality or wrongfulness of his acts on that night. (R. 977-79, 989, 1002-9.)
The State's first rebuttal witness, Dr. Lawrence F. Maier, testified that he began his evaluation of appellant on March 2, 1994. Dr. Maier testified that he did not believe that the appellant's mental illness affected his ability to appreciate the nature and quality or wrongfulness of his actions at the time of the crime. He also stated that any intoxicants the appellant might have ingested may have affected his judgment but that they did not prevent him from knowing the nature and quality or wrongfulness of his actions on that night. (R. 1051.) The appellant contends that the opinions of Dr. Maier, who admitted that he had not reviewed the appellant's medical records from Mountain View, are not as reliable as those of his own experts. However, Dr. Maier's testimony was not the sole source of the state's rebuttal.
The State's second rebuttal witness was Dr. Mary Traynor, who testified that she had treated the appellant on December 7, 1989, and on May 24, 1990. She testified that she took appellant off of Lithium after the May visit because he was not having any active psychotic symptoms. (R. 1086-90.)
The State's final rebuttal witness, Dr. Frank Preston, was also the strongest witness for the state's position that appellant was able to appreciate the nature and quality or wrongfulness of his actions at the time of Ms. McClure's murder. Dr. Preston testified that he had been treating the appellant from August 15, 1989, up until the time of the murder. (R. 1107.) He stated that during *235 this time he saw the appellant every other week. (R. 1110, 1118.) Most importantly, Dr. Preston testified that he saw the appellant on July 24, 1990, the day of the murder. He stated that at that time there were no symptoms from the appellant's discontinuance from Lithium. (R. 1121.) He stated that the appellant was oriented and gave him no indication that he was suffering from an active psychotic episode. (R. 1121-22.) He further testified that the appellant was not in a psychotic state, that his ability to communicate was not compromised, that his thought processes appeared to be clear, and that there was no mental illness manifesting itself at that time in a way that would have compromised his mental status. (R. 1125.)
Clearly, Dr. Preston's testimony alone is enough from which a jury could reasonably infer that the appellant had been aware of the nature and quality or wrongfulness of his actions on the night of the murder. There was also additional evidence from which a jury could have drawn this inference. The extensive planning that went into the killing, the appellant's deliberate efforts to hide evidence that would connect him with the crime, and his initial attempts to mislead investigators who questioned him regarding Ms. McClure's death all could have led the jury to reasonably conclude that appellant knew that what he did was wrong despite any mental illness from which he was suffering at the time.
Other items of evidence introduced at trial also suggested that the appellant's mental illness did not prevent him from appreciating the nature and quality or wrongfulness of his acts. Trial testimony showed that the appellant was able to regularly associate with three close friends on a daily basis for months before the murder in spite of his mental condition. He was also able to secure and maintain employment at a local restaurant up until the time he was arrested. Charleen Bottorff testified that he went to work on the morning after the murder.
The facts of this case are particularly troubling for a number of reasons. The defendant, apparently a very bright young man, is and has for some time been afflicted with a serious mental disorder. His parents have obviously spent a great deal of time and expended great effort seeking treatment for him. The psychiatrists who examined him both before and after the murder established at trial that the appellant indeed suffered from a mental disease. While trial testimony and common sense seem to suggest that the combination of his mental illness and his use of illegal drugs made the appellant a walking time bomb, other evidence showed that the he was not completely a victim of these circumstances. Although certainly a disability, the appellant's mental disease was not manifesting itself to the degree necessary for a not guilty by reason of insanity verdict.
The most vital testimony for the State was that of Dr. Preston, who had the opportunity to observe the appellant literally hours before the murder. Dr. Preston's testimony portrayed the appellant at that time as an individual who was functioning quite normally in spite of his mental illness and as a person who could realize the nature and quality or wrongfulness of his actions. This was sufficient evidence to lead a jury to conclude that the appellant was legally sane at the time of the murder. The evidence at trial showed that the murder of Ginger McClure was not a crime of passion or the act of a deranged and irrational mind, but the culmination of days of planning during which the appellant made a number of conscious decisions.
We may only reverse a judgment based on a jury's verdict where an insanity defense is presented "in those cases where the proof of insanity is overwhelming and uncontradicted." Boyle v. State, 229 Ala. 212, 222, 154 So. 575, 583 (1934). We cannot reverse the judgment after considering the testimony in the instant case. The jury had enough evidence before it to reach a guilty verdict. Consequently, the trial court did not err in allowing its denying the appellant's motion for a judgment of acquittal.
For the reasons stated, the judgment of the trial court is due to be, and is hereby, affirmed.
AFFIRMED.
*236 PATTERSON, McMILLAN, and LONG, JJ., concur.
TAYLOR, P.J., concurs in part and dissents in part with opinion.
TAYLOR, Presiding Judge, concurring in part; dissenting in part.
I concur in the majority's resolution of all the issues raised by the appellant except the issue discussed in Part XIII of the majority's opinion. The majority concludes that this issue was not preserved for appellate review because there was no specific objection at trial. Defense counsel objected to an investigator's testifying about the appellant's mental state. The objection was general. The majority concludes that because the objection was general, it waived all specific objections and nothing was preserved for appellate review. I do not agree.
Normally, a general objection does not preserve a specific issue for appeal. However, there are certain instances where a general objection will preserve error for appellate review.
"Quoting from Lawrence v. State, 409 So.2d 987 (Ala.Crim.App.1982), the Court of Criminal Appeals stated:
"`"Specific objections or motions are generally necessary before the ruling of the trial judge is subject to review, unless the ground is so obvious that the trial court's failure to act constitutes prejudicial error. Ward v. State, 376 So.2d 1112 (Ala.Cr.App.1979), cert. denied, Ex parte Ward, 376 So.2d 1117 (Ala.1979); Slinker v. State, 344 So.2d 1264 (Ala.Cr.App.1977)." 409 So.2d at 989. (Emphasis added.)'"
Ex parte Purser, 607 So.2d 301, 302 (Ala. 1992).
If the grounds for an objection are obviously plain, no specific objection is necessary. The objection made by the defense counsel put the trial court on notice that the appellant questioned the investigator's right to testify as to the appellant's mental state. This issue should be addressed by the majority; therefore, I dissent.
NOTES
[1] Mr. McDaniel was one of the appellant's defense attorneys at trial.