[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 406 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 407 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 408 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 409 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 410 
The appellant, Eddie Duvall Powell III, was convicted of four counts of capital murder: murder committed during the course of a burglary in the first degree, see § 13A-5-40(a)(4), Ala. Code 1975; murder committed during the course of a robbery in the first degree, see § 13A-5-40(a)(2), Ala. Code 1975; murder committed during a rape in the first degree, see § 13A-5-40(a)(3), Ala. Code 1975; and murder committed during sodomy in the first degree, see § 13A-5-40(a)(3), Ala. Code 1975. The jury, by a vote of 11-1, recommended that Powell be sentenced to death. The trial court imposed the death sentence recommended by the jury.
The record contains a summary of the facts and evidence presented, as found by the trial court. In pertinent part, the trial court's order states as follows:
 "The Defendant, Eddie Duval Powell, has been convicted in this case of capital murder. The jury has recommended the sentence of death. *Page 411 
 "(1) In the early morning hours before sunrise on March 25, 1995, the victim, [M.W.], was brutally attacked, raped, sodomized and shot to death. The victim was an elderly widow and was attacked in her home in Holt, Alabama, as she apparently attempted to escape her attacker.
 "(2) Defendant and a friend, Bobby Johnson, lived at the Johnson home across the street from the victim. Defendant and Bobby Johnson both worked at O'Charley's restaurant. Defendant borrowed Bobby Johnson's leather jacket and left the Johnson home in the early hours of March 25, 1995.
 "(3) The evidence plainly showed that the Defendant had been at the home of the victim, contrary to Defendant's statement. The Defendant's semen was found in the victim's mouth, rectum, and vagina. The victim's blood was found on the Defendant's pants and on Bobby Johnson's leather jacket, which was worn by the Defendant on this date. The Defendant's handprint was found on the window on the front of the victim's home, where a screen had been cut. A matchbook from O'Charley's restaurant was found in the unfinished basement under the victim's home immediately after the murder. The matchbook appeared to have been there only a short time since it had no dust on it, unlike most other things in the basement.
 "(4) The victim was shot about 5:25 A.M. on March 25, 1995, and the Defendant was first seen on videotape at the Shell Oil Station in Alberta City about an hour later at 6:27 A.M. This station was a walking distance of about forty-two minutes from the victim's home, considering a stop the Defendant made along the way, that was in evidence. The Shell Oil Station employee testified that the Defendant paid for wine mostly in nickels and had a lot of change in small coins. This was significant because the victim kept a container of small change in her purse for use in nickel and dime card games. The container of small change was missing, and the victim's handgun was missing also. The Defendant appeared at the Shell Oil Station wearing a leather jacket with a wet stain on it. The victim's blood was on the leather jacket worn by the Defendant on March 25, 1995. The Defendant wore this bloodstained jacket, which belonged to Bobby Johnson, to the residence of his friend, Jason Long, on the morning the victim was killed.
 "(5) Testimony showed that the contents of the leather jacket pockets included an O'Charley's matchbook, small change, and jewelry similar to jewelry owned by the victim. None of these items belonged to Bobby Johnson, who owned the jacket and stated that no bloodstain was on the jacket when the Defendant took it.
 "(6) The evidence showed that Defendant had a handgun after he arrived at the residence of Jason Long, which was about daybreak or between 6:30 and 7:00 A.M. on March 25, 1995. The Defendant asked Jason Long, who lived near the Shell Oil Station, to get rid of the handgun. Jason Long complied with this request, and the handgun was never found.
 "(7) On the morning of March 25, 1995, the Defendant had fresh scratches on the back of his neck. Lawrence Bunkley, an acquaintance of Defendant and a friend of Jason Long, testified that the Defendant told him on the day the victim was killed something to the effect that he did the bitch, she ran up on him and he shot her."
(C. 661-63.)
 I.
Powell contends that the trial court erred in denying his motion to suppress *Page 412 
his videotaped and audiotaped statements.
 "`"`In reviewing the correctness of the trial court's ruling on a motion to suppress, this Court makes all the reasonable inferences and credibility choices supportive of the decision of the trial court.'" Kennedy v. State, 640 So.2d 22, 26
(Ala.Cr.App. 1993), quoting Bradley v. State, 494 So.2d 750, 761 (Ala.Cr.App. 1985), aff'd, 494 So.2d 772 (Ala. 1986), cert. denied, 480 U.S. 923, 107 S.Ct. 1385, 94 L.Ed.2d 699 (1987). A trial court's ruling on a motion to suppress will not be disturbed unless it is "palpably contrary to the great weight of the evidence." Parker v. State, 587 So.2d 1072, 1088 (Ala.Cr.App. 1991).'
 "Rutledge v. State, 680 So.2d 997, 1002
(Ala.Cr.App. 1996)."
Maples v. State, 758 So.2d 1, 41 (Ala.Cr.App. 1999).
 A.
Powell asserts that he should have been informed of hisMiranda rights during his initial interview, pursuant to Mirandav. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Specifically, he argues that the videotaped interview with Stan Bush, a homicide investigator for the Tuscaloosa Police Department, was a custodial interrogation.
 "Miranda warnings are not necessarily required to be given to everyone whom the police question. Oregon v. Mathiason, 429 U.S. 492, 97 S.Ct. 711, 713, 50 L.Ed.2d 714 (1977). Miranda is only applicable when an individual is subjected to custodial interrogation. Davis v. Allsbrooks, 778 F.2d 168, 170 (4th Cir. 1985); Primm v. State, 473 So.2d 1149, 1158 (Ala.Crim.App.), cert. denied, 473 So.2d 1149
(Ala. 1985). `By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in a significant way.' Miranda, supra, 384 U.S. at 444, 86 S.Ct. at 1612.
 "There is a distinction which must be made between general interrogation and custodial interrogation since Miranda is inapplicable when interrogation is merely investigative rather than accusative. Kelley v. State, 366 So.2d 1145, 1148 (Ala.Crim.App. 1979); Primm, supra, at 1158; Johnston v. State, 455 So.2d 152, 156 (Ala.Crim.App.), cert. denied, 455 So.2d 152 (Ala. 1984). This distinction should be made on a case-by-case basis after examining all of the surrounding circumstances. United States v. Miller, 587 F. Supp. 1296, 1299 (W.D.Pa. 1984); Johnston, supra, at 156; Warrick v. State, 460 So.2d 320, 323 (Ala.Crim.App. 1984); Hall v. State, 399 So.2d 348, 351-52
(Ala.Crim.App. 1981); Kelley, supra at 1149."
Hooks v. State, 534 So.2d 329, 347-48 (Ala.Cr.App. 1987). SeeState v. Smith, 715 So.2d 925 (Ala.Cr.App. 1998).
In deciding whether the questioning of a suspect is a custodial interrogation, the following factors should be considered:
 "`(1) the language used to summon the individual, (2) the extent to which the defendant is confronted with evidence of guilt, (3) the physical surroundings of the interrogation, (4) the duration of the detention, and (5) the degree of pressure applied to detain the individual. United States v. Crisco, 725 F.2d 1228, 1231 (9th Cir.), cert. denied, 466 U.S. 977, 104 S.Ct. 2360, 80 L.Ed.2d 832 (1984). . . .'"
Hooks v. State, 534 So.2d at 348 (some citations omitted), quotingUnited States v. Wauneka, 770 F.2d 1434, 1438 (9th Cir. 1985). See also State v. Smith, 715 So.2d 925, 927 (Ala.Cr.App. 1998). *Page 413 
In Click v. State, 695 So.2d 209 (Ala.Cr.App. 1996), this Court stated:
 "It is well established that `the prosecution may not use statements, whether exculpatory or inculpatory, of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination.' Miranda v. Arizona, 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966). However, the safeguards required by Miranda are required only if the defendant is in custody when questioned. Berkemer v. McCarty, 468 U.S. 420, 440, 104 S.Ct. 3138, 3150, 82 L.Ed.2d 317 (1984); Landreth v. State, 600 So.2d 440, 444
(Ala.Cr.App. 1992).
". . . .
 "Also, the fact that the questioning occurred at the police station does not necessarily lead to a conclusion that appellant was in custody for Miranda purposes.
 "`[P]olice officers are not required to administer Miranda warnings to everyone they question. Nor is the requirement of warnings to be imposed simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect.'
 "Oregon v. Mathiason, 429 U.S. 492, 495, 97 S.Ct. 711, 714, 50 L.Ed.2d 714 (1977)."
695 So.2d at 216-17.
During the suppression hearing, Bush testified that he asked Cora Jennings, the victim's neighbor, to tell both Powell and Bobby Johnson to come to the police station and talk to him. Powell, Bobby Johnson, and Cora Jennings (Johnson's mother) lived across the street from the victim, and Bush believed Powell and Bobby Johnson had information about the murder. Additionally, Powell worked at O'Charley's restaurant and a matchbook from O'Charley's was found at the scene of the murder. Bush stated that Vincent Johnson, a friend of Powell's, drove Powell to the police station around 1:45 p.m. on March 25, 1995. According to Bush, he believed that Powell was a possible witness to the crime, and he began questioning Powell around 2:00 p.m.
Our review of the videotaped interview indicates that Bush began the interview around 2:00 p.m. in a small room in the police station. During the interview, Powell stated that he had graduated from high school in 1987 and that he was at the time of the interview 25 years old. Bush asked Powell several questions concerning where he was when the murder occurred. According to Powell, after he worked the evening shift at O'Charley's, he went home, and then he and his neighbor, Buddy, went to a nightclub. Powell stated that when he left the nightclub, he walked to the house of a prostitute. He further stated that after visiting the prostitute, he walked to a gas station in Alberta City, purchased some beer, and then walked to Jason Long's house, where he remained until the morning. During the interview, Bush told Powell that he was not a suspect but that he needed to know where Powell was the night that the murder occurred. Additionally, Bush asked Powell if he had seen anyone suspicious walking around the victim's house early in the morning, and asked him several questions about his roommate, Bobby Johnson.
At the suppression hearing Bush testified that, about one hour into the interview, he noticed that Powell was becoming evasive and that there were inconsistencies in his statement. At that point, he read Powell his Miranda rights. Our review of the videotape indicates that Bush did, in fact, read Powell his rights and that Powell stated that he understood his rights and signed a waiver of rights form. Bush asked Powell a few more questions and *Page 414 
then told him that he was free to leave. Powell said goodbye and left the interview room.
We conclude that Powell's interrogation did not become custodial until just before he was advised of his rights. Powell was summoned by Cora Jennings to talk to the police, and Powell voluntarily rode to the police station with a friend. Bush testified that he initially believed that Powell was a witness, but that, after Powell gave inconsistent and evasive answers, he suspected that Powell was involved in the crime. Bush stated that, as soon as he suspected that Powell was involved, he read him his Miranda rights. After examining all of the surrounding circumstances, we conclude that, before Powell was read hisMiranda rights, Bush's questions were investigative, rather than accusative. Moreover,
 "Nothing in the record suggests that the appellant was not free to leave the police station or that he was in custody until the point at which he became a suspect and was advised of his rights."
Click v. State, 695 So.2d at 217. Thus, Powell has failed to establish he was involved in a custodial interrogation before Bush advised him of his Miranda rights. Therefore, the trial court's determination to admit the videotaped statement was not "palpably contrary to the great weight of the evidence." Maples v. State, 758 So.2d at 41. The trial court did not err in admitting the videotaped statement into evidence.
Additionally, Powell argues that the trial court erred in admitting two subsequent statements he made after he was arrested for disorderly conduct inside the police station shortly after giving his first statement. Specifically, he argues that he should have been readvised of his Miranda rights and that he should have been given the opportunity to execute a waiver of rights form before each interrogation.
"Once the mandate of Miranda has been complied with at the threshold of the questioning it is not necessary to repeat the warnings at the beginning of each successive interview." Gibsonv. State, 347 So.2d 576, 582 (Ala.Cr.App. 1977). See alsoCleckler v. State, 570 So.2d 796 (Ala.Cr.App. 1990).
 "An accused may be read the Miranda rights prior to one interrogation but not confess until a later interrogation during which there was no rereading of the Miranda warning. As a general rule, it has been held that Miranda
warnings are not required to be given before each separate interrogation of a defendant after an original waiver of the accused's rights has been made. However, if such a long period of time has elapsed between the original Miranda
warning and the subsequent confession that it can be said that, under the circumstances, the accused was not impressed with the original reading of his rights in making the ultimate confession, then the confession should be held inadmissible."
C. Gamble, McElroy's Alabama Evidence, § 201.09 (5th ed. 1997) (footnotes omitted). See Phillips v. State, 668 So.2d 881, 883
(Ala.Cr.App. 1995).
During the suppression hearing, Bush testified that he conducted a second audiotaped interview with Powell around 4:30 p.m. on March 25, 1995.[1] Bush stated that when he began to read Powell his Miranda rights, Powell told him that he knew and understood his rights. According to Bush, Powell agreed to give a statement. *Page 415 
At the suppression hearing, Investigator Greg Burroughs testified that he and Investigator John Steele interviewed Powell around 2:00 a.m. on March 26, 1995. Burroughs stated that he reminded Powell of his Miranda rights, and that Powell indicated that he remembered and that he understood his rights and he agreed to speak with him.
Given that Powell was thoroughly advised of his Miranda
rights during his initial interview with Bush on March 25, that both Bush and Steele reminded Powell of his rights during the two subsequent interviews, and that the two subsequent interviews occurred within 12 hours of his initial waiver of his Miranda
rights, we conclude that the trial court did not err in admitting the audiotaped statements into evidence. See Tolbert v. State,450 So.2d 805 (Ala.Cr.App. 1984) (there was no necessity to re-inform defendant of his constitutional rights because defendant was reminded before his second and third statements that he had already been informed of his Miranda rights, he was asked if he remembered those rights, and he stated that he did and he agreed to talk with law enforcement officers). See also Cleckler v.State, 570 So.2d 796 (Ala.Cr.App. 1990).
 B.
Powell argues that he did not voluntarily, knowingly, and intelligently waive his Miranda rights; and thus, he claims, the trial court erred in admitting the three statements into evidence. Specifically, Powell argues that he was intoxicated and was suffering from fatigue when he made the statements.
This Court addressed the voluntariness of a waiver of Miranda
rights in Click v. State:
 "Whether a waiver is voluntary, knowing, and intelligent depends on the particular facts and underlying circumstances of each case, including the background, experience, and conduct of the accused — i.e., the totality of the circumstances. Magwood v. State, 494 So.2d 124, 135
(Ala.Cr.App. 1985), aff'd, 494 So.2d 154 (Ala.), cert. denied, 479 U.S. 995, 107 S.Ct. 599, 93 L.Ed.2d 599 (1986); Chandler v. State, 426 So.2d 477 (Ala.Cr.App. 1982) (citing Edwards v. Arizona, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981)); Myers v. State, 401 So.2d 288 (Ala.Cr.App. 1981.) The trial court need only be convinced from a preponderance of the evidence that a confession or inculpatory statement was voluntarily made. Magwood v. State, supra; Harris v. State, 420 So.2d 812
(Ala.Cr.App. 1982). The finding of the trial court as to voluntariness will not be disturbed unless it appears contrary to the great weight of the evidence. Dill v. State, 600 So.2d 343, 368
(Ala.Cr.App. 1991), aff'd, 600 So.2d 372 (Ala. 1992), cert. denied, 507 U.S. 924, 113 S.Ct. 1293, 122 L.Ed.2d 684 (1993); Magwood v. State, supra."
695 So.2d at 218.
In Jackson v. State, 674 So.2d 1318 (Ala.Cr.App. 1993), aff'd in pertinent part, 674 So.2d 1365 (Ala. 1994), this Court stated:
 "`"`[U]nless intoxication, in and of itself, so impairs the defendant's mind that he is "unconscious of the meaning of his words," the fact the defendant was intoxicated at the time he confessed is simply one factor to be considered when reviewing the totality of the circumstances surrounding the confession.' Carr v. State, 545 So.2d 820, 824 (Ala.Cr.App. 1989). `The intoxicated condition of an accused when he makes a confession, unless it goes to the extent of mania, does not affect the admissibility and evidence *Page 416 
of the confession, but may effect its weight and credibility.' Callahan v. State, 557 So.2d 1292, 1300 (Ala.Cr.App.), affirmed, 557 So.2d 1311 (Ala. 1989)."
 "`White v. State, 587 So.2d 1218
(Ala.Cr.App. 1990).'
 "State v. Austin, 596 So.2d 598, 601
(Ala.Cr.App. 1990)."
674 So.2d at 1326. See also Gaddy v. State, 698 So.2d 1100, 1117
(Ala.Cr.App. 1995), aff'd, 698 So.2d 1150 (Ala.), cert. denied,118 S.Ct. 634, 139 L.Ed.2d 613, 522 U.S. 1032 (1997). "`Mere emotionalism and confusion do not dictate a finding of mental incompetency or insanity' so as to render a statement inadmissible."Callahan v. State, 557 So.2d 1292, 1300 (Ala.Cr.App. 1989), quoting Sullivan v. Alabama, 666 F.2d 478, 483 (11th Cir. 1982).
During the suppression hearing, Bush testified that, before the initial interview, Powell told him that he had been drinking earlier in the day. Bush stated that Powell's ability to communicate did not appear to be impaired, and that he did not appear to be suffering from any mental disease or emotional shock. Bush further stated that Powell was not threatened, coerced, or offered any inducements in return for giving his statements. Although Mike Everett, an officer with the Tuscaloosa County Homicide Unit, testified that, after Powell's first interview but before his second interview, he had seen Powell drinking in the parking lot of the station, Everett testified that, in his opinion, Powell was not intoxicated when he was interviewed.
Here, the trial court was presented with conflicting testimony as to whether Powell was under the influence of alcohol. "`When there is conflicting evidence of the circumstances surrounding an incriminating statement or a confession, it is the duty of the trial judge to determine its admissibility, and if the trial judge decides it is admissible his decision will not be disturbed on appeal "unless found to be manifestly contrary to the evidence."'" A.W.M. v. State, 627 So.2d 1148, 1150 (Ala.Cr.App. 1993), quoting Ex parte Matthews, 601 So.2d 52, 53 (Ala.), cert. denied, 505 U.S. 1206, 112 S.Ct. 2996, 120 L.Ed.2d 872 (1992). See, e.g., Burgess v. State, [Ms. CR-94-0475, December 18, 1998] ___ So.2d ___ (Ala.Cr.App. 1998); Burks v. State, 600 So.2d 374,380 (Ala.Cr.App. 1991); Leonard v. State, 551 So.2d 1143, 1148
(Ala.Cr.App. 1989). As did the trial court, we have reviewed the videotaped and audiotaped statements. We conclude, as did the trial court, that there is no indication that Powell was so intoxicated that he could not comprehend his circumstances or that his statements were rendered involuntary.
Additionally, we reject Powell's argument that his statements were not voluntary because, he says, when he made them he had been deprived of food or sleep for a prolonged time. See, e.g., Parduev. State, 695 So.2d 199 (Ala.Cr.App. 1996). Indeed, there was no testimony from any officers that Powell had not received any food or had been prevented from sleeping between each of his statements, or that he was exhausted to the point of being unable to give a voluntary statement. The record simply does not establish that Powell was deprived of food or sleep. Moreover, whether a defendant was physically exhausted when he gave his statement is merely one factor to be considered by the jury in determining the credibility and weight to afford the statement.Burgess v. State, supra.
There was ample evidence from which the trial court could conclude that Powell's statements were knowingly and voluntarily made. No error occurred in their admission. *Page 417 
 II.
Powell maintains that the trial court erred in failing to order a change of venue for his trial because, he says, many of the jurors had heard about the case through what he says was extensive media coverage, and this exposure prevented him from receiving a fair trial.
The defense produced several newspaper articles and television stories concerning the incident. During the voir dire examination of potential jurors, the veniremembers were asked whether they had read or heard anything concerning M.W.'s death. Those who responded that they did have prior knowledge of the offense were questioned individually. All of the potential jurors indicated that they could put what they had read in the newspaper or seen on television out of their minds.
 "`"[A] change of venue must be granted only when it can be shown that the pretrial publicity has so `pervasively saturated' the community as to make `the court proceedings nothing more than a "hollow formality"' . . . or when actual prejudice can be demonstrated. The burden of showing this saturation of the community or actual prejudice lies with the appellant."'
 "George v. State, [717] So.2d [827] at 833 [(Ala.Cr.App. 1996)], quoting Oryang v. State, 642 So.2d 979, 983 (Ala.Cr.App. 1993).
". . . .
 "`The defendant is not entitled to jurors who are totally ignorant of the facts and issues involved in the case or to jurors who never entertained a preconceived notion as to the defendant's guilt of innocence. Ex parte Grayson, 479 So.2d 76, 80 (Ala.), cert. denied, 474 U.S. 865, 106 S.Ct. 189, 88 L.Ed.2d 157 (1985). A defendant is entitled to a trial by jurors who can lay aside any preconceived impressions or opinions and render a verdict based on the evidence which is presented at trial, id. The record in this case indicates that the appellant received such a trial. See also Murphy v. Florida, 421 U.S. 794, 799-800, 95 S.Ct. 2031, 2036, 44 L.Ed.2d 589 (1975); Irvin v. Dowd, 366 U.S. 717, 723, 81 S.Ct. 1639, 1643, 6 L.Ed.2d 751 (1961). Because the appellant has failed to show that the pre-trial publicity in this case was "inherently prejudicial," Holladay v. State, [549 So.2d 122 (Ala.Cr.App. 1988)], or "presumptively prejudicial," Kuenzel v. State, 577 So.2d 474 (Ala.Cr.App. 1990), affirmed, 577 So.2d 531 (Ala. 1991), and the appellant has also failed to show that there was actual juror prejudice, we find no abuse of discretion by the trial court or manifest error in his finding of impartiality and his denial of the appellant's motion for change of venue. Irvin v. Dowd, 366 U.S. at 724, 81 S.Ct. at 1643; Ex parte Grayson, 479 So.2d at 80.'
"Oryang v. State, 642 So.2d at 993-94."
Boyd v. State, 715 So.2d 825, 848 (Ala.Cr.App. 1997).
"`Newspaper articles or widespread publicity, without more, are insufficient to grant a motion for change of venue.'" Harrisv. State, 632 So.2d 503, 517-18 (Ala.Cr.App. 1992), quoting Exparte Grayson, 479 So.2d 76, 80 (Ala.Cr.App. 1985), cert. denied,474 U.S. 865, 106 S.Ct. 189, 88 L.Ed.2d 157 (1985).
The voir dire conducted by the trial court and by counsel clearly showed that none of the prospective jurors was prejudiced by the pretrial publicity. Therefore, Powell has failed to show any actual prejudice resulting from the pretrial publicity. *Page 418 Boyd v. State, supra; Williams v. State, 710 So.2d 1276
(Ala.Cr.App. 1996), aff'd, 710 So.2d 1350 (Ala. 1997), cert. denied,524 U.S. 929, 118 S.Ct. 2325, 141 L.Ed.2d (1998); Oryang v. State,642 So.2d 989, 993 (Ala.Cr.App. 1994). Cf. Ex parte Neal,731 So.2d 621 (Ala. 1999); Burgess v. State, supra; Hyde v.State, 778 So.2d 199 (Ala.Cr.App. 1998); and Price v. State,725 So.2d 1003 (Ala.Cr.App. 1997), aff'd, 725 So.2d 1063 (Ala. 1998), cert. denied, 526 U.S. 1133, 119 S.Ct. 1809, 143 L.Ed.2d 1012 (1999). Thus, the trial court did not abuse its discretion in denying Powell's motion for a change of venue. See Harris v. State, 632 So.2d 503,517 (Ala.Cr.App. 1992), citing Ex parte Magwood, 426 So.2d 929,931 (Ala.), cert. denied, 462 U.S. 1124, 103 S.Ct. 3097,77 L.Ed.2d 1355 (1983).
 III.
Powell contends that the trial court erred in admitting into evidence a jacket and its contents.[2] Powell argues that the jacket and the contents of the pockets of the jacket were irrelevant because, he claims, there was no evidence linking him to the items. He also argues that even if the jacket and the contents of its pockets were relevant, they should not have been introduced into evidence because, he says, the evidence was highly prejudicial. Additionally, he argues that the state did not establish a proper chain of custody for the admission of the jacket.
 A.
We must address whether the jacket and the contents of its pockets are relevant to Powell's case, and if so, whether the evidence's "probative value is substantially outweighed by the risk of unfair prejudice, confusion, or a tendency to mislead the trier of fact." (Appellant's brief at p. 27.)
Rule 401, Ala.R.Evid., defines "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."
The test of relevancy sanctioned by the Alabama appellate courts has been described as a "liberal test of relevancy under which evidence is admissible if it has any probative value, however slight, upon a matter in the case." C. Gamble, McElroy'sAlabama Evidence § 21.01(1) (5th ed. 1996). In Henderson v.State, 598 So.2d 1045 (Ala.Cr.App. 1992), this Court stated:
 "`"The test of probative value or relevancy of a fact is whether it has any tendency to throw light upon the matter in issue even though such light may be weak and fall short of its intended demonstration." Tate v. State, 346 So.2d 515, 520
(Ala.Cr.App. 1977). "It is not necessary that each item of testimony, taken alone, be conclusively shown to prove the guilt of the defendant; but the question is whether each fact, in connection with all others, may be properly considered in forming a chain of circumstantial evidence tending to prove the guilt of the accused." Russell v. State, 38 So. 291, 296 (Ala. 1905).'"
598 So.2d at 1047-48, quoting Barrow v. State, 494 So.2d 834, 835
(Ala.Cr.App. 1986).
Rule 403, Ala.R.Evid., states:
 "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or *Page 419 
misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."
This Court stated in Miles v. State, 715 So.2d 913
(Ala.Cr.App. 1997):
 "The trial court is vested with broad discretion when determining matters of relevancy and this Court may not overturn its decision except in cases where there is an abuse of discretion. Primm v. State, 473 So.2d 1149 (Ala.Cr.App. 1985), citing C. Gamble, McElroy's Alabama Evidence, § 21.01(1), § 21.01(6) (3d ed. 1977); McLeod v. State, 383 So.2d 207 (1980). According to the liberal standard adopted in Alabama, such an abuse of discretion can occur only when evidence that has no probative value is introduced. McElroy's, § 21.019(1)."
715 So.2d at 919-20. See Knotts v. State, 686 So.2d 431, 444
(Ala.Cr.App. 1995).
Powell argues that there was no evidence linking him to the bloodstained suede jacket recovered from Jason Long's house.
During a preliminary hearing, Investigator John Steele testified that during Powell's first interview, Powell stated that he had spent the night with Jason Long. Officers were sent to Long's residence. At trial, Long testified that he informed Steele that Powell had visited him at his residence early in the morning on March 25, that Powell was wearing a jacket, and that Powell left the jacket at his house. Steele testified that Long gave the jacket to the officers. During the hearing, Investigator Burroughs testified that, in the police station after his initial interview and shortly before he was arrested for disorderly conduct, Powell picked up the bloodstained suede jacket that had earlier been recovered from Long's house and was sitting on an officer's desk, and he tried to put the jacket on. Additionally, Investigator Rocky Montgomery testified that, although Bobby Johnson told him that the jacket was his, Johnson noticed that the jacket was missing from his home on the morning of the murder. Powell was Bobby Johnson's roommate. Investigator Burroughs testified that a videotape from a local gas station recorded at 6:27 a.m. on March 25 revealed that when Powell entered the station he was wearing a brown suede jacket with a noticeable wet spot on the left chest area, similar to the jacket Long gave the officers shortly after the murder occurred. Thus, there was overwhelming and relevant evidence that linked Powell to the jacket.
Powell also argues that there is no evidence linking the change found in the jacket to him or to the murder.
Investigator Montgomery testified that Bobby Johnson told him that he did not place the change, the jewelry, or the matchbooks in the jacket pockets. At trial, A.W., the victim's son testified that his mother kept her change in a square container. A.W. stated that, after the murder, he was unable to locate the container. Investigator Burroughs testified that change was strewn across M.W.'s carport. In addition, Burroughs stated that the videotape from the gas station revealed that Powell paid for an alcoholic beverage with a large amount of change. Thus, evidence linked the change found in the jacket to Powell and to the murder, burglary, and robbery of M.W.
Additionally, Powell argues that the evidence of the matchbooks found in the jacket pocket and outside M.W.'s house was irrelevant, and that there was no evidence linking Powell to the matchbooks.
Testimony indicated that Powell and Bobby Johnson both worked at O'Charley's restaurant and lived across the street from the victim. The matchbooks recovered *Page 420 
from the scene and from the jacket pocket were from the O'Charley's restaurant. As previously stated, Powell was seen wearing a suede jacket the morning that the murder occurred and an O'Charley's matchbook was found in the pocket of the jacket. Thus, relevant and sufficient evidence linked Powell to the matchbooks.
In addition, Powell argues that the jewelry found in the jacket pocket was not linked to the crime.
Investigator Burroughs testified that M.W.'s jewelry box was lying upside down on her bedroom floor. A.W. testified that his mother owned a gold herringbone chain necklace similar to the necklace found in the jacket linked to Powell. He further testified that he was unable to find the necklace after his mother was killed. According to Burroughs, several of M.W.'s relatives told him that the other jewelry found in the jacket pocket was similar to jewelry worn by M.W. Thus, there was sufficient and relevant evidence linking the jewelry to Powell and to the murder, burlgary, and robbery.
Given that there was overwhelming circumstantial evidence linking the relevant items to the crime and to Powell, we conclude that the probative value of the evidence substantially outweighed its prejudicial impact.
 B.
Powell maintains that the jacket was inadmissible because, he claims, a chain of custody for the jacket was not established from the time the crime was committed until the police seized the jacket, and from the time the jacket was seized until trial. Specifically, Powell argues that the jacket was inadmissible because there was no testimony establishing who had access to the jacket from the time Powell left Jason Long's house until the jacket was given to the police. Additionally, Powell argues that the state did not establish who had access to the jacket after it was taken from Jason Long's residence.
"Proper analysis of a chain of custody question . . . does not begin at the time of the offense; the chain of custody begins when [an] item of evidence is seized by the State." Burrell v.State, 689 So.2d 992, 995-96 (Ala.Cr.App. 1996); State v.Conrad, 241 Mont. 1, 785 P.2d 185 (1990); 29A Am.Jur.2d,Evidence § 947 (1994 ed.) ("The chain-of-custody rule does not require the prosecution to account for the possession of evidence before it comes into their hands."). Once the state obtains the evidence, then it "`need only prove to a reasonable probability that the object is in the same condition as, and not substantially different from, its condition at the commencement of the chain.'"Turner v. State, 610 So.2d 1198, 1200-01 (Ala.Cr.App. 1992), quoting Sommer v. State, 489 So.2d 643, 645 (Ala.Cr.App. 1986).
Testimony indicated that, on March 25 around 6:00 a.m., after Powell visited a gas station while wearing a suede jacket, he walked across the street to Jason Long's residence where he slept for a few hours. Investigator Burroughs testified that Long told him that Powell was wearing the jacket when he arrived, and that Powell left the jacket at his house when he left later that morning. Investigator Rocky Montgomery testified that, around 3:00 p.m., he and Investigator Steele went to Long's house and that Long handed the jacket to Steele. Although Powell contends that someone at Long's house may have placed the jewelry, matchbook, and change in the jacket pocket after he left, Powell offers no evidence in support of this argument. His contention does not affect the admissibility of the evidence based on a chain-of-custody objection. Therefore, whether someone other *Page 421 
than Powell placed the items in the jacket pocket was only a relevant question for the jury to decide. Burrell v. State, supra.
In Ex parte Scott, 728 So.2d 172 (Ala. 1998), the Supreme Court stated:
 "`In Ex parte Holton, 590 So.2d 918, 920
(Ala. 1991), the Alabama Supreme Court stated:
 "`"The chain of custody is composed of `links.' A `link' is anyone who handled the item. The State must identify each link from the time the item was seized. In order to show a proper chain of custody, the record must show each link and also the following with regard to each link's possession of the item: `(1) [the] receipt of the item; (2) [the] ultimate disposition of the item, i.e., transfer, destruction, or retention; and (3) [the] safeguarding and handling of the item between receipt and disposition.' Imwinklereid, The Identification of Original, Real Evidence, 61 Mil.L.Rev. 145, 159 (1973).
 "`"If the State, or any other proponent of demonstrative evidence, fails to identify a link or fails to show for the record any one of the three criteria as to each link, the result is a `missing' link, and the item is inadmissible. If, however, the State has shown each link and has shown all three criteria as to each link, but has done so with circumstantial evidence, as opposed to the direct testimony of the `link,' as to one or more criteria or as to one or more links, the result is a `weak' link. When the link is `weak,' a question of credibility and weight is presented, not one of admissibility."'"
728 So.2d at 182, quoting Knight v. State, 659 So.2d 931, 932
(Ala.Cr.App. 1993). See Jackson v. State, [Ms. CR-97-2050, May 28, 1999] ___ So.2d ___ (Ala.Cr.App. 1999); Thomas v. State,766 So.2d 860 (Ala.Cr.App. 1998).
Whether a trial court erred in overruling an objection made on chain-of-custody grounds is reviewed under an abuse-of-discretion analysis. Akin v. State, 698 So.2d 228,232-33 (Ala.Cr.App. 1996), cert. denied, 698 So.2d 238 (Ala. 1997).
Jason Long testified that he showed Investigator Steele and Montgomery Powell's jacket, which was hanging in his bedroom closet. Long stated that Steele took the jacket from the closet; however, Steele testified that Long handed him the jacket. At trial, Long testified that the jacket appeared to be in substantially the same condition at trial as when Steele removed it from his house. Steele testified that, after Long gave him the jacket, he returned to the police station. Bush stated that Steele placed the jacket on an officer's desk, and that he received the jacket from Steele around 3:30 p.m. Bush further stated that he found approximately $3.00 in change, one O'Charley's matchbook, two condoms and various items of jewelry in the pockets of the jacket. Bush testified that he left the items in the pockets of the jacket, and that he placed the jacket in a brown paper bag. Bush further testified that he remained with the jacket the entire time that it was at the police station. According to Bush, Mitch Rector conducted a presumptive test at the police station on the stain on the jacket to determine whether it was blood. Bush stated that he then gave the jacket to Mike Everett. Everett testified that, around 10:00 p.m., he drove to O'Charley's and showed the jacket to Bobby Johnson, who identified the jacket as being his property. Everett stated that he then returned to the police station and gave the jacket to Bush. Bush testified that he secured the jacket. Bush *Page 422 
further testified that, on March 28, he transferred the jacket to Johnny Dyer.
Dyer testified that he received the jacket from Bush in a sealed condition and that he transported it to the Department of Forensic Sciences lab in Tuscaloosa. Dyer further testified that he gave the jacket to John McDuffie, the director of the Tuscaloosa lab. McDuffie testified that he received the jacket in its sealed condition from Dyer. Mike Lee testified that he received the sealed jacket from the Tuscaloosa lab on April 19, and that he transported it to the Department of Forensic Sciences serology lab in Birmingham, and placed it in a locker. Larry A. Huys, a forensic scientist, testified that on April 20, he took the jacket out of the locker and analyzed the stain on a portion of the jacket. He further testified that he cut part of the jacket in order to perform the analysis, and that the jacket was in his exclusive care, custody, and control. Huys stated that he transferred the jacket to Dyer on July 13. Dyer testified that he transported the jacket from the Birmingham lab to the Tuscaloosa lab. McDuffie testified that he received the jacket from Dyer on July 13. Additionally, McDuffie testified that he gave the jacket to Mitch Rector on or about September 22. Rector testified that he transferred the jacket from the Tuscaloosa lab to the Birmingham lab on September 22. Huys testified that the jacket remained at the Birmingham lab in his exclusive care and control until he transferred the jacket to Rector on November 20. Rector testified that he transferred the jacket to the Tuscaloosa lab. McDuffie testified that he received the jacket at the Tuscaloosa lab on November 20, and that it remained in his constant care and control. McDuffie stated that, on September 4, 1997, he gave the jacket to the court reporter for the trial court.
In this case, the circumstantial and direct evidence established that the jacket was received, retained, and safeguarded by the police. Thus, any weak links in the chain of custody go to the weight and credibility of the evidence, rather than to its admissibility. See Ex parte Scott, supra.
Moreover, the jacket was admissible under § 12-21-13, Ala. Code 1975, which states:
 "Physical evidence connected with or collected in the investigation of a crime shall not be excluded from consideration by a jury or court due to a failure to prove the chain of custody of the evidence. Whenever a witness in a criminal trial identifies a piece of evidence connected with or collected in the investigation of a crime, the evidence shall be submitted to the jury or court for whatever weight the jury or court may deem proper. The trial court in its charge to the jury shall explain any break in the chain of custody concerning the physical evidence."
Accordingly, we find no error as to this claim. Loggins v.State, 771 So.2d 1070 (Ala.Cr.App. 1999).
 IV.
Powell contends that his indictment charging him with the separate offenses of murder during the course of a burglary in the first degree, murder during the course of a robbery in the first degree, murder during a rape in the first degree, and murder during sodomy in the first degree was multiplicitous and violated the Double Jeopardy Clause of the Fifth Amendment to the United States Constitution.
"[T]he test in determining whether the charges run afoul of the Double Jeopardy Clause is whether each crime *Page 423 
contains a statutory element not contained in the other." Williamsv. State, 710 So.2d 1276, 1321 (Ala.Cr.App. 1996), citingBlockburger v. United States, 284 U.S. 299, 52 S.Ct. 180,76 L.Ed.2d 306 (1932).
The Supreme Court of Alabama addressed a similar issue in Exparte McWilliams, 640 So.2d 1015 (Ala. 1993), aff'd on return to remand, 666 So.2d 89 (Ala.Cr.App. 1994), aff'd, 666 So.2d 90 (Ala. 1995), cert. denied, 116 S.Ct. 723 (1996), wherein the Court stated:
 "In Grady v. Corbin, 495 U.S. 508, 110 S.Ct. 2084, 109 L.Ed.2d 548 (1990), the United States Supreme Court addressed the scope of coverage of the Double Jeopardy Clause, as follows:
 "`The Double Jeopardy Clause embodies three protections: "It protects against a second prosecution for the same offense after acquittal. It protects against a second prosecution for the same offense after conviction. And it protects against multiple punishments for the same offense." North Carolina v. Pierce, 395 U.S. 711, 717, 89 S.Ct. 2072, 2076, 23 L.Ed.2d 656 (1969) (footnotes omitted). The Blockburger [v. United States, 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed.2d 306
(1932),] test was developed "in the context of multiple punishments imposed on a single prosecution." Garrett v. United States, 471 U.S. 773, 778, 105 S.Ct. 2407, 2411, 85 L.Ed.2d 764
(1985).'
 "Grady, 495 U.S. at 516-17, 110 S.Ct. at 2090-91, 109 L.Ed.2d at 561. This Court has also held that the Double Jeopardy Clause of the Alabama Constitution, Art. I, § 9, applies only in three areas enumerated above. Ex parte Wright, 477 So.2d 492 (Ala. 1985).
 "In this case, McWilliams was not prosecuted for the same offense after an acquittal; nor was he prosecuted for the same offense after a conviction. That is, he was not prosecuted twice for the same offense. Moreover, while in King [v. State, 574 So.2d 921 (Ala.Cr.App. 1990),] the defendant received four separate prison sentences for the same offense, McWilliams has only been sentenced to die once and, indeed, can only be put to death once.
 "In the context of prescribing multiple punishments for the same offense, the United States Supreme Court has stated that `the Double Jeopardy Clause does no more than prevent the sentencing court from prescribing greater punishment than the legislature intended.' Missouri v. Hunter, 459 U.S. 359, 366, 103 S.Ct. 673, 678, 74 L.Ed.2d 535 (1983).
 "In the present case, it is clear that the jury knew that it was convicting McWilliams of murdering Patricia Reynolds only once. It is also clear that the jury knew McWilliams's crime was made capital because his victim was murdered in the course of one robbery and one rape. We conclude, therefore, that the sentencing court has not prescribed a greater punishment than the legislature intended."
640 So.2d at 1022.
In this case, the facts clearly reveal that the jury knew it was convicting Powell of one murder — i.e., the murder of M.W. Additionally, the facts established that the crime was made capital because M.W. was murdered during the course of one burglary, one robbery, one rape, and one act of sodomy. Because each crime contained an element of an offense not committed in the other, the charges did not run afoul of the Double Jeopardy Clause.
 "We therefore conclude that under the Blockburger
test, the appellant was properly indicted and convicted for . . . *Page 424 
separate and distinct capital offenses `notwithstanding a substantial overlap in the proof offered to establish the crimes,' Ianelli v. United States, 420 U.S. 770, 785 n. 17, 95 S.Ct. 1284, 1293 n. 17, 43 L.Ed.2d 616
(1975); Jackson v. State, 516 So.2d 726, 761 (Ala.Cr.App. 1985), rem'd on other grounds, 516 So.2d 768 (Ala. 1986)."
Williams v. State, 710 So.2d 1276, 1321 (Ala.Cr.App. 1996).
Therefore, the charges were not multiplicitous and Powell's conviction on the four counts did not violate the Double Jeopardy Clause.
 V.
Powell contends that the trial court erred in denying his motion to suppress evidence seized after his arrest for disorderly conduct. Specifically, he contends that his clothing and samples of his blood, saliva, hair, semen, and tissue were unlawfully seized because, he says, his arrest was illegal.
First, we must determine whether probable cause existed to arrest Powell for disorderly conduct.
In State v. Johnson, 682 So.2d 385 (Ala. 1996), our Supreme Court held that:
 "The level of evidence needed for a finding of probable cause is low. `An officer need not have enough evidence or information to support a conviction [in order to have probable cause for arrest]. . . . "[O]nly the probability, and not a prima facie showing, of criminal activity is the standard of probable cause."' Stone v. State, 501 So.2d 562, 565 (Ala.Cr.App. 1986). `"Probable cause exists where `the facts and circumstances within [the arresting officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that' an offense has been or is being committed."' Young v. State, 372 So.2d 409, 410 (Ala.Cr.App. 1979) (quoting Draper v. United States, 358 U.S. 307, 313, 79 S.Ct. 329, 333, 3 L.Ed.2d 327 (1959))."
682 So.2d at 387-8.
Section 15-10-3(a)(1), Ala. Code 1975, states, in pertinent part: "An officer may arrest a person without a warrant, on any day and at any time . . . [i]f a public offense has been committed or a breach of the peace threatened in the presence of a police officer."
Section 13A-11-7(a), Ala. Code 1975, states, in pertinent part:
 "A person commits the crime of disorderly conduct if, with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof, he:
 "(1) Engages in fighting or in violent tumultuous or threatening behavior; or
"(2) Makes unreasonable noise; or
 "(3) In a public place uses abusive or obscene language or makes an obscene gesture. . . ."
Investigator Stan Bush testified that, during Powell's initial videotaped interview, he read Powell his Miranda rights. Bush testified that Powell voluntarily executed a waiver form indicating that he understood his rights. Bush stated that, after the interview, he told Powell that he was free to go, and that Powell left the building. Bush stated that he went to his office and reviewed some paperwork, and that he then walked outside to look at Vincent Johnson's car. According to Bush, as he was walking back to the building, he saw Powell and asked him to return to the station because Bush wanted to see if the shoe prints found in a crawlspace underneath M.W.'s home matched the *Page 425 
soles of Powell's shoes.[3] Bush stated that Powell agreed to return to the station, and that, while he went into another room to get a camera, he heard Powell begin to loudly use profanity. Tuscaloosa County Deputy Taylor Powell testified that, while he was in the process of a shift change, he saw Powell standing in the lobby and that Powell was cursing. Deputy Taylor Powell stated that Powell used loud and abusive language, and that Powell said, "You better tell those punk-ass police there ain't no bitches over here." (R. 439.) Taylor Powell further stated that Powell referred to the police as "mother-fuckers." (R. 439.) Additionally, Taylor Powell testified that Tom Lowe, the Chief of the Tuscaloosa Police Department, homicide office, told him to arrest Powell for disorderly conduct. Taylor Powell stated that he handcuffed Powell and transported him to the county jail. Lloyd Baker, a deputy for the Tuscaloosa County Sheriff's Department, testified that just before Powell's arrest Powell was "being very loud and profane with his words, directing profane or abusive language toward the deputies." (R. 458.) According to Baker, Powell would calm down for a moment and then "start back up." (R. 458.) Lowe testified that he ordered an officer to arrest Powell because of his loud use of profanity and his unruly behavior in the hall outside the main homicide office. Because Powell cursed loudly and used abusive language in the presence of several police officers at the police station, the officers had sufficient probable cause to arrest Powell for the misdemeanor offense of disorderly conduct. Thus, we conclude his arrest was lawful.
 A.
Powell maintains that the trial court erred in denying his motion to suppress and in admitting into evidence in his capital murder trial the clothing he was wearing when he was arrested for disorderly conduct.
In United States v. Robinson, 414 U.S. 218, 94 S.Ct. 467,38 L.Ed.2d 427 (1973), the United States Supreme Court held:
 "A custodial arrest of a suspect based on probable cause is a reasonable intrusion under the Fourth Amendment; that intrusion being lawful, a search incident to the arrest requires no additional justification. It is the fact of the lawful arrest which establishes the authority to search, and we hold that in the case of a lawful custodial arrest a full search of the person is not only an exception to the warrant requirement of the Fourth Amendment, but is also a `reasonable' search under that Amendment."
414 U.S. at 235, 94 S.Ct. at 477. See State v. Adams, 643 So.2d 606,610 (Ala.Cr.App. 1992).
A police officer may search for and seize any evidence on the arrestee's person, even if the evidence is unrelated to the crime for which the arrest was made, in order to prevent concealment or destruction of evidence. See Thomas v. State, 666 So.2d 849,853-54 (Ala.Cr.App. 1993), rev'd on other grounds, 666 So.2d 855 (Ala. 1995) (cocaine discovered in defendant's pockets after an arrest for disorderly conduct was admissible at trial where defendant was charged with disorderly conduct and possession of cocaine.); Exparte Scarbrough, 621 So.2d at 1010 (confession to a murder, obtained while defendant was under arrest for traffic violation, *Page 426 
was admissible at trial); Chimel v. California, 395 U.S. 752,89 S.Ct. 2034, 23 L.Ed.2d 685 (1969). Moreover, a search incident to a lawful arrest does not have to be made immediately on arrest. "[S]earches and seizures that could be made on the spot at the time of arrest may legally be conducted later when the accused arrives at the place of detention." United States v. Edwards,415 U.S. 800, 803, 94 S.Ct. 1234, 1237, 39 L.Ed.2d 771 (1974). See also Abel v. United States, 362 U.S. 217, 80 S.Ct. 683,4 L.Ed.2d 668 (1960).
Having determined that Powell's arrest for disorderly conduct was lawful, the subsequent search of his person and seizure of his clothes incident to that lawful arrest was permissible. SeeTaylor v. State, 239 Ga. App. 858, 522 S.E.2d 266 (1999);State v. Staten, 238 Neb. 13, 469 N.W.2d 112 (1991);Pinkston v. State, 189 Ga. App. 851, 377 S.E.2d 864 (1989); and 2 LaFavre, Search and Seizure § 5.3 (3d ed. 1996). Therefore, the trial court did not err in denying Powell's motion to suppress these items.
Additionally, the admission of the evidence was proper because the seizure of an arrestee's clothing is a reasonable administrative procedure. Cf. Ayers v. State, 659 So.2d 177
(Ala.Cr.App. 1994). During the suppression hearing, Taylor Powell testified that it is standard procedure in Tuscaloosa County to seize the clothing of an arrested person if the person is to be incarcerated and dressed in a jumpsuit. Taylor Powell further testified that the police often use their discretion in determining whether a loud and boisterous person who is arrested and charged with disorderly conduct will be permitted to make bond and leave or whether to remove the person's clothes and issue him or her a jumpsuit. Taylor Powell stated that he had planned to make Powell change into a jumpsuit after he had finished booking him for disorderly conduct, and that Bush arrived and seized Powell's clothing before he had finished the booking procedure. The fact that Powell's clothes were seized before Taylor Powell finished booking Powell does not constitute a Fourth Amendment violation. Because Powell's clothing would have been seized and inventoried at the conclusion of booking, no error occurred in this regard.
Finally, we reject Powell's argument that the seizure of his clothing was unlawful because, he says, he was illegally detained after his arrest for the misdemeanor offense of disorderly conduct. Specifically, he argues that he should have been permitted to pay his bond and leave without being detained and forced to change clothes.[4]
Rule 4.3(a)(1)(iii), Ala.R.Crim.P. provides that, in a warrantless arrest situation, a probable cause hearing must be held within 48 hours, where the defendant remains in custody. SeeRiverside v. McLaughlin, 500 U.S. 44 (1991).
Here, Powell was arrested for disorderly conduct on March 25, 1995. Investigator Bush testified that Powell's clothing was seized shortly after his arrest for disorderly conduct on March 25, 1995. Given that Powell's clothing was seized within 48 hours of his arrest for disorderly conduct, he may not now argue that he was illegally detained during the seizure of his clothing. *Page 427 
Based on the foregoing, the trial court's refusal to suppress the evidence found on Powell's clothing was not "palpably contrary to the great weight of the evidence."
 B.
Powell maintains that the trial court erred in denying his motion to suppress and in admitting into evidence the test results of his blood, saliva, hair, semen, and tissue samples. Specifically, he argues that the affidavit in support of the warrant was based on hearsay and did not establish probable cause to believe that he had participated in the offense.
In Jones v. State, 719 So.2d 249 (Ala.Cr.App. 1996), this Court stated:
 "A finding of probable cause may be based completely on hearsay evidence, `provided that there is a substantial basis for believing the evidence under the totality of the circumstances.' Rule 3.9(b), Ala.R.Crim.P. `An issuing judge's determination that sufficient probable cause existed to support the warrant "is entitled to great deference and is conclusive in the absence of arbitrariness."' Wamble v. State, 593 So.2d 109, 110 (Ala.Cr.App. 1991), citing United States v. Pike, 523 F.2d 734 (5th Cir. 1975), reh'g denied, 525 F.2d 1407, cert. denied, 426 U.S. 906, 96 S.Ct. 2226, 48 L.Ed.2d 830 (1976). We must determine whether the issuing judge had a `substantial basis' for concluding that probable cause existed. Wamble v. State; Illinois v. Gates, 462 U.S. 213, 238, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527 (1983)."
719 So.2d at 254. (Emphasis added.)
Powell was arrested and charged with murder at 2:05 a.m. on March 26. On March 28, Bush applied for a warrant to compel Powell to submit to the taking of specimens or samples of blood, saliva, and hair from his person. The affidavit in support of the trial court's order that Powell submit to the taking of specimens or samples of blood, saliva, and hair from his person stated, in pertinent part, the following:
 "My name is Stan Bush. I am a police officer with the Tuscaloosa Police Dept. I am currently assigned as an investigator to the Tuscaloosa County Homicide Unit (TCHU).
 "On March 25, 1995, [M.W.] was the victim of a home invasion murder. She was a 70-year-old white female who lived alone at 3516 19th St. N.E. Holt, Al. She was shot numerous times and was also beaten. After the shooting and assault took place in the bedroom of [M.W.'s] residence, [M.W.] was able to walk from her residence to the front yard of her neighbor (Cora Jennings) before she collapsed (3423 19th St. N.E.). Another of [M.W.'s] neighbors, Ruth Kizziah, also ran to [M.W.'s] aid, Mrs. Kizziah has told me that [M.W.] told her that an unknown black male had raped and shot her. [M.W.] was physically unable to give any more of a description before she died.
 "The investigation conducted by the Tuscaloosa County Homicide Unit indicated that the suspect who had shot [M.W.] had attempted to gain entry into [M.W.'s] residence through a front living room window. Investigators were able to lift palm prints from the glass of this window. The suspect gained entry into the [M.W.] home through the back bathroom window. Fibers were recovered from the brick at the bathroom window seal. Investigators believe that [M.W.] was assaulted in her bedroom. There was a large concentration of blood, hair and fibers on and about her bed which I observed.
 "Investigation led to one Eddie Duvall Powell (3423 19th St. N.E.). Powell has *Page 428 
been arrested numerous times for burglary, robbery and assault. Mitch Rector of Dept. of Forensic Science in Tuscaloosa has told me that Powell's palm prints have been identified by him as those that were recovered from the front living room window by investigators. Powell's clothing that he was wearing on [March 25] have also been recovered and have a large amount of blood on them.
 "I have talked with the Medical Examiner Johnny Dyer who advised that [the] preliminary autopsy report did not indicate any sexual assault had taken place but he did stress that microscopic results have not been returned and the results are not final.[5]
Blood, hair and saliva samples obtained from the suspect could be used to compare with those submitted as evidence to help identify the assailant as various samples of hair and blood were recovered from the crime scene."
(C. 706-07.)[6]
The affidavit additionally stated:
 "Based upon the foregoing facts and information, your affiant believes and states that there is probable cause to believe and does believe that Eddie Duval Powell was the assailant who burglarized [M.W.'s] residence and shot her to death and that the said Eddie Duval Powell should be ordered to submit to the taking of samples of his hair, blood and saliva for comparison to the evidence obtained during the investigation."
(C. 707.)
In this case, the affidavit indicated that Powell's handprint was discovered on M.W.'s window, that M.W. told her neighbor that her assailant was an African-American male, and that Powell's clothing, which was obtained on the day of the murder, contained several bloodstains. We find that the facts detailed in Bush's affidavit were sufficient to form a substantial basis for the trial judge's determination that probable cause existed to support an order to obtain samples of blood, saliva, hair, semen, and tissue. Thus, the trial court did not err in denying Powell's motion to suppress and in admitting the test results into evidence.
 VI.
Powell contends that the trial court erred in admitting into evidence photographs showing scratches on his neck. Specifically, he argues that the trial court's order was invalid, because, he says, the affidavit in support of the order to photograph the scratches on his neck did not establish probable cause and was based on hearsay.
As previously stated in Part V of this opinion, a finding of probable cause may be based solely on hearsay evidence, "`provided there is a substantial basis for believing the evidence under the totality of the circumstances.'" Jones v. State, 719 So.2d at 254, quoting Rule 3.9(b), Ala.R.Crim.P.
Additionally, we note that, in general, the mere observation of a person's physical characteristics does not constitute aFourth Amendment search. See Nguyen v. State, 547 So.2d 582, 585
(Ala.Cr.App. 1988). "`Moreover, it is no search to *Page 429 
"record" those characteristics, in effect, by taking a picture of the individual.'" Nguyen v. State, 547 So.2d at 585, quoting LaFave,Search and Seizure, § 2.6(a) (1987).
In this case, the affidavit in support of the trial court's order to photograph scratches on Powell's neck stated the same facts listed in the affidavit discussed in Part V of this opinion. Additionally, the affidavit stated:
 "I also observed some scratches on Powell's neck which have a straight-line pattern to them and may have been caused by his entry through [M.W.'s] window.
 "Based upon the foregoing facts and information, your affiant believes and states that there is probable cause to believe and does believe that Eddie Duvall Powell was the assailant who burglarized [M.W.'s] residence and shot her to death and that the said Eddie Duval Powell should be ordered to submit to the taking of a photograph of his neck and samples of his hair, blood and saliva for comparison to the evidence obtained during the investigation."
(C. 712-13.) The trial court ordered Powell to submit to the taking of a photograph of his neck based on the information contained in the affidavit. (C. 711.)
In this case, the affidavit indicated that the suspect had entered M.W.'s house through the bathroom window. Bush personally saw long scratches on the back of Powell's neck, which he believed may have been caused by Powell's entry into the house through the window. Moreover, Bush stated that a large amount of blood was found on Powell's clothing. Additionally, Bush stated that Mitch Rector, a forensic scientist, told him that Powell's palm prints were recovered from M.W.'s living room. Thus, we find that the facts detailed in Bush's affidavit were sufficient to form a substantial basis for the trial court's determination that probable cause existed to support the issuance of an order to photograph the scratches on Powell's neck.
In addition, Powell argues that the photograph should have been excluded under Rule 402 and Rule 403, Ala.R.Evid., because, he says, it was not relevant, it had little or no probative value, and it was highly prejudicial. Specifically, he argues that the scratches on the back of his neck were not linked to the charged offenses.
Rule 403, Ala.R.Evid., provides that relevant evidence may be excluded if its "probative value is substantially outweighed by the danger of unfair prejudice." A determination whether the probative value of evidence is substantially outweighed by the danger of unfair prejudice rests within the sound discretion of the trial court. Hayes v. State, 717 So.2d 30 (Ala.Cr.App. 1997).
In Fisher v. State, 665 So.2d 1014 (Ala.Cr.App. 1995), we stated:
 "As to the appellant's contention that the photographs are prejudicial, all evidence that tends to make out the case of one litigant is prejudicial to the opposing litigant. If it were not in some way prejudicial to the opposing party, one would question its relevance. An authenticated photograph may be received into evidence if it tends to `prove or disprove some disputed issue, . . . illustrate or elucidate some relevant fact or . . . corroborate or disprove some other evidence offered or to be offered.' C. Gamble, McElroy's Alabama Evidence, § 123.03(1) (4th ed. 1991)."
665 So.2d at 1019. See also Snell v. State, 565 So.2d 265, 267-68
(Ala.Cr.App. 1989), rev'd on other grounds, 565 So.2d 271 (Ala. 1990) (photographs depicting scratches on defendant's body were relevant to prove that a struggle occurred during rape). *Page 430 
In this case, the photographs of the scratches on Powell's neck were relevant to the issue whether Powell burglarized M.W.'s house by entering through a window. Lincoln Irvin testified that he cut Powell's hair on the evening of March 24, 1995, and that there were no scratches on Powell's neck. Cora Jennings testified that, around noon on March 25, 1995, she noticed scratches on the back of Powell's neck. In Powell's videotaped interview, which was played to the jury, he stated that the scratches on his neck were caused by a razor during a haircut. Thus, the trial court did not err in determining that the photographs of Powell's neck were relevant and that their probative value was not substantially outweighed by the danger of unfair prejudice.
 VII.
Powell contends that the trial court erred in denying his motion for a mistrial because, he says, the jury venire was racially diluted and the trial court erred in denying his Batson
motion.
 A.
Powell contends that the trial court erred in denying his motion for a mistrial; the motion was based on the "racial dilution of the jury panel." (Appellant's brief at p. 46.) Specifically, he argues that the method used by the circuit clerk of dividing a large jury panel among various courtrooms denied him a jury venire that represented a fair cross-section of the community.
In Dobyne v. State, 672 So.2d 1319 (Ala.Cr.App. 1994), this Court stated:
 "`[T]he fair cross-section requirement "ensures only a venire of randomness, one free of systematic exclusion. It does not ensure any particular venire." Note, United States v. Gelb: The Second Circuit's Disappointing Treatment of the Fair Cross-Section Guarantee, 57 Brook.L.Rev. 341, 343 n. 7 (1991). "Rather than being entitled to a cross-sectional venire," a defendant "has a right only to a fair chance, based on a random draw, of having a jury drawn from a representative panel." Comment, The Cross-Section Requirement and Jury Impartiality, 73 Cal.L.Rev. 1555, 1565 (1985)."
Dobyne v. State, 672 So.2d at 1329, quoting Sistrunk v.State, 630 So.2d 147, 150 (Ala.Cr.App. 1993).
Our review of the record indicates that there were approximately 120 potential jurors on the jury panel — 29 of whom were African-American. After the panel was qualified by the trial court, the potential jurors were divided among the various courtrooms.[7] This division of the jury pool resulted in a jury venire for Powell's trial of 38 individuals — 9 of whom were African-American. After challenges for cause were granted, three African-American veniremembers were left on the panel. Defense counsel timely objected to the division of the jury panel on the grounds that the division prevented Powell from "having a fair and accurate cross-section of the community." (R. 1066.) The trial court determined that the court's practice was to divide jurors among the various courtrooms, and denied Powell's motion for a mistrial.
Given that the jury panel was divided among the courtrooms, there is no evidence that certain groups of veniremembers *Page 431 
were systematically excluded from the jury pool. Thus, the trial court did not err in denying Powell's motion for a mistrial.Dobyne v. State, supra.
 B.
Powell contends that the trial court erred in finding that he did not prove a prima facie case of racial discrimination underBatson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69
(1986). Specifically, he argues that the state's use of one of its peremptory challenges to remove juror number 106 from the jury venire and its selection of juror number 2 as its second alternate juror violated Batson. We disagree.
In support of his Batson motion, Powell argued that because the state removed one African-American juror and selected another African-American juror as an alternate, the state's strikes were not race-neutral. Our review of the record indicates that out of a jury pool of 38 veniremembers, 9 members were African-American. After challenges for cause were granted, 3 members were African-American. The state removed juror number 106, and selected juror number 2 as an alternate. The third African-American veniremember remained on the jury panel. The trial court determined that Powell failed to establish a prima facie Batson violation; therefore, it did not require the State to explain its reasons for its peremptory strikes of the African-American veniremembers.
"`Merely showing that the challenged party struck one or more members of a particular race is not sufficient to establish a prima facie case.'" Farrior v. State, 728 So.2d 691, 699
(Ala.Cr.App. 1998), quoting Edwards v. State, 628 So.2d 1021, 1024
(Ala.Cr.App. 1993); Moore v. State, 677 So.2d 828, 829
(Ala.Cr.App. 1996). A defendant fails to establish a prima facie case of discrimination under Batson and Ex parte Branch,526 So.2d 609 (Ala. 1987), where the defendant fails to show any evidence of discrimination other than the number of African-American veniremembers who were struck. Young v. State, 730 So.2d 1251,1253-54 (Ala.Cr.App. 1998); Moore v. State, 677 So.2d at 829. "`It is within the sound discretion of the trial court to determine if the State's peremptory challenges of black jurors are motivated by intentional racial discrimination.'" Taylor v.State, 666 So.2d 36, 43 (Ala.Cr.App. 1994), aff'd 666 So.2d 73
(Ala. 1995), cert. denied, 516 U.S. 1120, 116 S.Ct. 928,133 L.Ed.2d 856 (1996), quoting Ex parte Lynn, 543 So.2d 709, 712
(Ala. 1988), cert. denied, 493 U.S. 945, 110 S.Ct. 351,107 L.Ed.2d 338 (1989). "A circuit court's ruling on a Batson
objection is entitled to great deference, and we will reverse a circuit court's Batson findings only if they are clearly erroneous." Stokes v. State, 648 So.2d 1179, 1181 (Ala.Cr.App. 1994) (citations omitted).
In this case, the defense based its Batson challenge exclusively on the number of African-American veniremembers who were struck from the jury and who were selected as alternates. The fact that the state used one of its strikes to remove an African-American veniremember and selected one African-American veniremember as an alternate does not establish a prima facie case of discrimination. Thus, the trial court did not abuse its discretion by finding that the Powell failed to prove a prima facie Batson violation.
Based on the foregoing, the trial court's denial of the Powell's motion was not clearly erroneous.
 VIII.
In accordance with Rule 45A, Ala.R.App.P., we have examined the record for any plain error with respect to Powell's capital *Page 432 
murder convictions and death sentence, whether or not brought to our attention or to the attention of the trial court. We find no plain error or defect in either the guilt phase or the sentencing phase of Powell's trial.
We have also reviewed Powell's sentence in accordance with § 13A-5-53, Ala. Code 1975, which requires that, in addition to reviewing the case for any error involving Powell's capital murder convictions, we also review the propriety of the death sentence. Our determination must include a review of the following: (1) whether any error adversely affecting the rights of the defendant occurred in the sentence proceedings; (2) whether the trial court's findings concerning the aggravating and mitigating circumstances were supported by the evidence; and (3) whether death is the appropriate sentence in this case. Section13A-5-53(b) requires that, in determining whether death is the proper sentence, we ascertain: (1) whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor; (2) whether an independent weighing by this court of the aggravating and mitigating circumstances indicates that death is the proper sentence; and (3) whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.
After the jury convicted Powell of the capital offenses charged in the indictment, a separate sentence hearing was held before the jury in accordance with §§ 13A-5-45 and -46, Ala. Code 1975. After hearing evidence concerning the aggravating circumstances and the mitigating circumstances; after being properly instructed by the trial court as to the applicable law; and after being correctly advised as to its function in reference to the finding of any aggravating and mitigating circumstances, the weighing of those circumstances, and its responsibility in returning an advisory verdict, the jury recommended, by a vote of 11-1, a sentence of death by electrocution.
Thereafter, the trial court held another hearing, in accordance with § 13A-5-47, Ala. Code 1975, to determine whether it would sentence Powell to death as the jury recommended or to life imprisonment without the possibility of parole. The trial court ordered and received a written presentence investigation report, as required by § 13A-5-47(b). After the hearing, the trial court entered specific written findings concerning the existence or nonexistence of each aggravating circumstance enumerated in § 13A-5-49, Ala. Code 1975, each mitigating circumstance enumerated in § 13A-5-51, Ala. Code 1975, and any nonstatutory mitigating circumstance found to exist under §13A-5-52, Ala. Code 1975, as well as written findings of fact summarizing the offense and Powell's participation in the offense.
In its findings of fact, the trial court found the existence of two statutory aggravating circumstances: (1) that the murder was committed while Powell was engaged in committing or attempting to commit, or fleeing after committing, or attempting to commit rape, robbery, or kidnapping, see § 13A-5-49(4), Ala. Code 1975; and (2) that the capital offense was especially heinous, atrocious, or cruel compared to other capital offenses, see §13A-5-49(8), Ala. Code 1975. With regard to its finding that the capital offense was especially heinous, atrocious, or cruel compared to other capital offenses, the trial court stated:
 "The State proved this circumstance beyond a reasonable doubt. The victim was an older woman, who was not in good health. The victim was horribly assaulted about the head with a blunt weapon with several blows hard enough *Page 433 
to tear her scalp and render her unconscious. She was brutally raped and sodomized orally and rectally. She was pursued from her home and shot five or six times, resulting in her death. The manner in which the victim was killed was unnecessarily torturous to the victim for an undetermined period of time. This killing of this victim was the epitome of a conscienceless or pitiless homicide."
(C. 666.)
The trial court found the existence of one statutory mitigating circumstance: the age of the defendant (he was 25 years old) at the time of the crime, see § 13A-5-51(7), Ala. Code 1975. The trial court found the existence of the following nonstatutory mitigating circumstances:
 (1) that Powell exhibited signs of mental or emotional problems that went untreated;
 (2) that Powell suffered direct or indirect abuse at some time in his life;
 (3) that Powell was detrimentally affected by his family's instability during his early and middle years;
 (4) that Powell had suffered some degree of neglect and deprivation in his early childhood years as the result of family turmoil, instability, and other factors;
 (5) that Powell has friends and relatives who love him and do not want to see him die;
 (6) that Powell has demonstrated the capacity to love and to care for another human being. As a young father, he cared for and demonstrated devotion to his children. This love was expressed in practical day-to-day ways, such as changing diapers, and bathing and feeding the infants, and in more profound ways, such as searching for employment;
 (7) that Powell was suffering from unrelated, yet real stresses, at the time of the crime; and
 (8) that Powell assisted other inmates while incarcerated.
(C. 669.)
The trial court's sentencing order reflects that after considering all the evidence presented, the arguments of counsel, the presentence report, the advisory verdict of the jury, and after weighing the aggravating circumstances against any statutory and nonstatutory mitigating circumstances, the court determined that the aggravating circumstances outweighed the mitigating circumstances. Accordingly, the trial court properly sentenced Powell to death. We conclude that the trial court's findings concerning the aggravating circumstances and the mitigating circumstances are supported by the evidence.
Powell was convicted of one count of the offense of murder committed during the course of a burglary, one count of murder committed during the course of a robbery, one count of murder committed during a rape, and one count of murder committed during the course of sodomy. These offenses are defined by statute as capital offenses. See §§ 13A-5-40(a)(2),(3), and (4), Ala. Code 1975. We take judicial notice that similar crimes have been punished capitally throughout the state. See, e.g., Freeman v.State, 776 So.2d 160 (Ala.Cr.App. 1999); Barnes v. State,704 So.2d 487 (Ala.Cr.App. 1997); Hutcherson v. State,677 So.2d 1174 (Ala.Cr.App. 1994), rev'd on other grounds, 677 So.2d 1205
(Ala. 1996); Dubose v. State, 662 So.2d 1156 (Ala.Cr.App. 1993), aff'd, 662 So.2d 1189 (Ala. 1995); Kuenzel v. State,577 So.2d 474, 530 (Ala.Cr.App. 1990), aff'd, 577 So.2d 531
(Ala. 1991), cert. denied, 502 U.S. 1050 (1992); Henderson v. State,583 So.2d 276, 304 (Ala.Cr.App. 1990), aff'd, 583 So.2d 305 *Page 434 
(Ala. 1991), cert. denied, 503 U.S. 908 (1992).
After carefully reviewing the record of the guilt phase and the sentencing phase of Powell's trial, we find no evidence that the sentence was imposed under the influence of passion, prejudice or any other arbitrary factor. We conclude that the findings and conclusions of the trial court are abundantly supported by the evidence. We have independently weighed the aggravating circumstances against the statutory and nonstatutory mitigating circumstances, and we concur in the trial court's judgment that death is the appropriate sentence in this case. Considering the crimes committed by Powell, we find that the sentence of death is neither excessive nor disproportionate to the penalty imposed in similar cases.
Powell's convictions and his sentence of death are affirmed.
AFFIRMED.
Long, P.J., and McMillan and Cobb, JJ., concur; Baschab, J., recuses herself.
[1] Bush initially interviewed Powell around 2:00 p.m. on March 25, 1995. Powell was first informed of his Miranda rights at approximately 3:00 p.m. on March 25.
[2] The state admitted the jacket into evidence. Testimony at trial conflicted as to whether the jacket was leather or suede. However, each of the witnesses identified the jacket admitted into evidence by the state.
[3] The record does not support Powell's argument that he was being illegally detained at this time.
[4] Powell also asserts that he was not permitted to make bond for his arrest for disorderly conduct. However, contrary to Powell's assertion, our review of the record indicates that a $500 bond was set. (C. 753.) Moreover, during the hearing on the motion to suppress, Bush testified that, during his second interview with the appellant, he told Powell to talk to the officers at the booking desk to find out the amount of his bond.
[5] Although the preliminary report did not indicate a sexual assault, the actual autopsy showed the presence of semen and did indicate that the victim had been sexually assaulted.
[6] We note that this portion of the affidavit is identical to a portion of the affidavit attached to the trial court's order to obtain photographs of Powell's neck showing scratches.
[7] Powell did not challenge the randomness of the circuit court's division of the panel among the various courtrooms at trial. In his brief to this court, Powell states, "[t]he circuit court randomly split that panel with one-half going to Judge Gay Lake's courtroom for [his] trial and one half going to the other three circuit judges."